ALABAMA & VICKSBURG RAILWAY CO. *v.* HENRY TURNBULL.

1. RELEASE. *Claim for damages. Fraud.*

One injured by a railroad company, who, on a compromise settlement, releases his claim for damages, and afterwards, in an action at law, seeks to avoid the release, must show by clear and convincing evidence that it was procured by fraud or misrepresentation such as would authorize its cancellation by a court of equity.

2. SAME. *Confidential relation. Physician and patient. Case.*

An illiterate negro employed in a compress was severely crushed by defendant's train, and was attended by one not his medical adviser, but a physician summoned by his employer. The physician, suggesting that defendant ought to pay damages, negotiated therefor, and communicated propositions, which were refused, among other reasons, because plaintiff had not consulted with friends. Two weeks after the injury, plaintiff being discharged as apparently convalescent, the physician accompanied defendant's claim agent to plaintiff's home, and induced him to sign

a release for one hundred dollars and the assumption of the medical bill. He relied on their assurance that he would shortly be well. However, he grew worse, and became permanently disabled. A year later, he first learned that the physician was the retained surgeon of defendant, expected to attend such cases and look after its interest. He then promptly tendered back the money, and in a suit for damages obtained a verdict for $4,000, approved by the court below. *Held*, the evidence does not show fraud and misrepresentation such as will avoid the release.

FROM the circuit court of the first district of Hinds county. HON. J. B. CHRISMAN, Judge.

Action by appellee, Henry Turnbull, against the Alabama & Vicksburg Railway Company, to recover ten thousand dollars damages for personal injuries. At the time of the injury plaintiff was a laborer in the employ of a compress company, and was engaged about his duties in trucking cotton on the platform of said company, and within its inclosure. A spur track of defendant's railroad enters the compress building, and was used for placing cars within the same, convenient for loading and unloading. On the day in question, according to plaintiff's testimony, a train of cars was either negligently pushed or kicked or allowed to roll on said track without any warning, and plaintiff, who was on the track adjusting a gangplank between the platforms, was caught by the cars and very severely crushed. As the opinion has no reference to the circumstances attending the injury, it is unnecessary to further state the facts as to this.

Defendant pleaded a release of damages by the plaintiff, and to the plea plaintiff filed replications, which, as stated in the opinion, raised the question of its validity, plaintiff contending that it was obtained through fraud and undue influence. The testimony in behalf of plaintiff throwing light on this question, which is held to be decisive of the cause as presented on this appeal, tended to show the following facts : When injured, plaintiff was found to have been caught between the gangplank and the backing cars, and his stomach was crushed into the space of four or five inches. He was taken up from the track in an unconscious condition,

and the superintendent of the compress at once telephoned for Dr. Wirt Johnston, a physician, who came in response to the call, and, on his advice, plaintiff was taken home, and thereafter said physician continued to attend him, no arrangement or any mention having been made as to who was responsible for his fees. Plaintiff was very badly hurt, but grew better, and after a few days Dr. Johnston told him that he had mentioned to the agent of the railroad company that it ought to pay him something on account of his injuries, as he was a poor colored man without means and having a wife and family to support, that the agent had sent him to offer twenty-five dollars. To this plaintiff replied, that he would not consider twenty-five dollars, and that he had not consulted with any one on the subject, not even his wife. To this the doctor replied that it was immaterial to him, that he was acting merely out of kindness to plaintiff because he was a poor colored man. Further conversation was had, during which the doctor sought to get him to agree to compromise, and during which plaintiff stated that he had no idea that the company would start with an offer less than one hundred dollars. A few days later, Dr. Johnston and E. L. Stevenson, claim agent of the defendant, went together to plaintiff's home, and found him sitting up, but complaining of feeling somewhat worse. After inquiring as to his health, the agent expressed pleasant surprise at his improved condition, and told him he had come to settle with him for his damages; that he was prepared to give him seventy-five dollars. Turnbull stated that he was not ready to make a settlement, and that he had so told Dr. Johnston, to which the agent replied that it would save a great deal of trouble, and that if he sued he would get nothing, that the lawyer would get it all. He told Turnbull that he had only brought seventy-five dollars, and after some time asked Dr. Johnston if he had any money, and borrowed from him twenty-five dollars, and threw it into plaintiff's lap. Turnbull persisted in his refusal to accept it, saying that the doctor had been coming every

day, that he was not nearly well, and that by the time he finished paying the doctor and other expenses there would be nothing left. The latter then told him that he had nothing to do with the doctor's bill, as the compress would settle it. Turnbull said no, that if he got any thing out of the railroad, he would have to get all from it. Then Stevenson proposed that he would give Turnbull one hundred dollars, and that Dr. Johnston should look to him for all the other bills. Turnbull again referred to his not being well yet, and Dr. Johnston told him he would be as well as ever in the course of three or four weeks, and able again to labor at the compress. Stevenson then said: "I don't know what to think of a man who will have a doctor who gets him up and he don't have any confidence in him;" and Dr. Johnston remarked, "I told you coming out here that he wanted a lawsuit." The conversation was continued about twenty minutes or half an hour, and finally Turnbull accepted the one hundred dollars, and signed, by his mark, a release, previously prepared by Stevenson, by which he relinquished all claim for damages consequent on the injury. His signature, a mark, was witnessed by his wife and by Dr. Johnston.

The foregoing is substantially the testimony of plaintiff and of his wife as to what was said and done in reference to the settlement before and at the time the release was signed. In some important particulars they are contradicted by the testimony of Dr. Johnston and of Stevenson, who agree in testifying that the settlement was freely and voluntarily made by Turnbull. It was shown that Dr. Johnston was the regularly retained local surgeon of the defendant company at Jackson; that he was not paid a salary, but paid under an agreed fee-bill for cases attended. His duties were to attend to cases of persons injured by the company whenever called on by the superintendent; to report injuries and receive instructions as to whether he should take charge of them. But sometimes he attended cases in an emergency without waiting for instructions. In this case he had no instructions from

the superintendent, and, when called to wait on Turnbull, opened an account on his books against the compress company. However, while attending to the case, and before the release was given, he heard from the company that it was perhaps liable, and after that supposed it would pay his bill, but did not feel authorized to make out a bill against the railroad company until the same was definitely assumed by Stevenson for the company at the time of the settlement. Dr. Johnston admitted undertaking the negotiation for a compromise, but says he did so on his own responsibility, and, also, that neither he nor Stevenson ever mentioned the fact that he was surgeon of the railroad company, his own reason being that he deemed the fact immaterial. He denied loaning Stevenson the money to make out one hundred dollars paid plaintiff, and denied that any unfair advantage or any misrepresentations were made to Turnbull, and also denied that he assured him that he would shortly be well. Dr. Johnston says that Turnbull had authorized him to offer to the company to accept one hundred dollars, and had named that amount as what he would agree to take. He admitted that he urged plaintiff to accept the one hundred dollars, and, when he refused, told him he had thought he was a man of his word.

The testimony of Stevenson, who was an attorney, and the claim agent of defendant, and who was a witness on the first trial, corroborated that of Dr. Johnston in most particulars. He stated, however, that in his negotiations and conversations with Dr. Johnston he considered him as acting in the capacity of the company's surgeon, who had been called in by the compress company to attend plaintiff; that Dr. Johnston had never before aided him in effecting a settlement, but the surgeons of the company were expected to keep the interest of the company at heart; that when he came from his home in Vicksburg to make the settlement, he considered that it had all been arranged and agreed on, and took the doctor to the home of plaintiff merely to show him the way.

After executing the release, plaintiff grew worse, and, after some months, was furnished by defendant with a pass to New Orleans, to enable him to go to the charity hospital in that city, where he remained a short time, without obtaining relief, and returned to Jackson. About ten months after the accident, having been confined at home a great part of the time because of the injury, he took advice of attorneys as to his rights, and then, for the first time, was made aware that Dr. Johnston, when he attended him and promoted the compromise, was the retained surgeon of the railroad company. On their advice, he at once tendered back the one hundred dollars, the amount paid him in settlement, and interest, and, this being refused, brought this action to recover for the injuries.

The case was tried at the July term, 1893, resulting in a verdict for $4,000, which the court set aside because of an instruction as to the alleged negligence. At the next term, a second trial resulted in a verdict for plaintiff for $6,500. This was deemed excessive by the court, and, on motion for a new trial, plaintiff entered a remittitur for $2,500, and the verdict was then allowed to stand for $4,000. Judgment accordingly, and defendant appeals.

The opinion contains a further statement of the case.

*Nugent & McWillie*, for appellant.

Plaintiff, in his replication to the plea setting up a release *pro forma*, averred certain facts in avoidance. As to this, the affirmative of the issue was on him. It was incumbent upon him to sustain the allegations of fraud and circumvention by clear and indisputable evidence. *Railroad Co.* v. *Shay*, 82 Pa. St., 198. This he failed to do. There was neither threat, force nor intimidation employed; the plaintiff made the settlement voluntarily, and is concluded by it. There is no fact in the record calculated in the least to throw suspicion on the transaction. Had the jury obeyed the instruction as to this, the verdict would have been for defendant. But this was not done; there was a railroad in the case.

*Brame & Alexander*, for appellee.

This is the case of an illiterate negro, weakened in body and mind by suffering, away from friends and advisers, beset by the shrewd claim agent and attorney of the railroad company, who, to compass his purpose, used the company's surgeon, and, by art and persuasion amounting in law to fraud, secured the release for the pitiable sum of $100. This, too, when they both knew that the man was injured for life. One jury has assessed his damages at $4,000, and another at $6,500. It is not disputed that plaintiff was ignorant of the fact that Dr. Johnston was the regularly retained surgeon of the company, and that he relied upon his statements and advice as coming from his own physician. Johnston admits that he did not intimate to the negro that he was the surgeon of the railroad company, and that he used every effort to induce him to compromise for this trivial sum. We find him, at the outset, using the wires to get the claim agent here. Then we find him using every effort to get the man to settle for a small sum, and, finally, he goes with the claim agent to clinch the settlement, and stands by when the agent tells him he is not seriously hurt, and not only does not protest, but actually urges the negro to accept the $100 in full.

As to the confidential relations between physician and patient, see Story's Eq. Jur., § 314. As to the duty to disclose material facts, see *Ib.*, § 237.

For a case very similar to this, see *Bussian* v. *Railway Co.*, 56 Wis., 325, s.c. 10 Am. & Eng. R. R. Cas., 716. See, also, 30 *Ib.*, 60.

For a case where there was overreaching, and where the parties did not deal on equal terms, see *Herschfield* v. *Railway Co.*, 2 Q. B. Div., 1. We also refer to *Packet Co.* v. *Defries*, 94 Ill., 598; 41 Minn., 169; 107 N. C., 738; *Welsh* v. *Railway Co.*, 70 Miss., 20.

Argued orally by *W. L. Nugent*, for appellant, and *L. Brame*, for appellee.

WOODS, J., delivered the opinion of the court.

The first and third replications of the plaintiff in the court below to the second plea of the defendant may be disregarded by us. The first replication denies the execution of the release pleaded by defendant, and the third asserts that the release was obtained by imposition and misrepresentation practiced upon and made to the plaintiff by defendant's agent, who procured the release, as to the character of the paper signed, the plaintiff being made to believe that the release was only designed to cover the expenses of his illness, and to compensate him for his loss of time resulting from the injuries complained of in the declaration to this suit. These attacks upon the release, however, were not pressed. There is no sufficient evidence which will entitle them to any examination.

The second replication embraces the matters set up in the third, but it also sets up the real grounds upon which the plaintiff seeks to defeat and destroy the release, and to this second replication we address ourselves.

It is contended that the release was procured by a disregard of the professional relation which the physician bore to his patient, and by the concealment from the patient of the relation which the physician sustained to the railway company; and it is also further contended that the appellee was induced to make the release by certain misrepresentations made to him by the eminent physician who attended him, and by the claim agent of the railway company who effected the settlement with him now sought to be avoided under the replication we are considering.

Let us examine, in the light of the evidence offered by the appellee, these alleged misrepresentations and test their character. They will be found to rest upon statements said, by the appellee and his wife, to have been made by the physician and the railway company's agent touching the nature and extent of the appellee's injuries. The former, it is asserted, declared to the appellee that he would be well in

three or four weeks, and would, therefore, be able to do his accustomed work, whereby the patient was imposed upon and deceived, and misled into signing the release. It must be remembered that the injuries had been inflicted two weeks before the settlement was effected; that the injured man was so far on the way to recovery as to dress and sit up; and that he was that day discharged by his physician as one not requiring further personal attention at his hands. As matter of fact, the man needed no medical attention for several days thereafter, when he had what he denominates a "set back." It appeared that the patient was on the way to sure recovery, under the circumstances just narrated. It was natural for the physician, learned and skilled as he was and is, to believe, and to give expression to his belief, that his patient would soon be well again. It was, however, the expression of an opinion only—an opinion, in our judgment, reasonably founded upon the then existing conditions. It turns out that the unhappy man's injuries were lasting and very much more serious than was then supposed; but we are not to pass upon the then apparent state of the hurt in the light of the after developments of the case. The most learned and accomplished man in the medical and surgical ranks makes no pretense to pierce the darkness of futurity and foretell its secrets. He looks at what is before him and judges for the present, just as do all others. The opinion of the physician in this instance was an honest one, a reasonable one, a just one as the case then stood.

These remarks apply with equal force to the supposed misrepresentations of the railway company's agent. There was only an expression of his opinion as to the injured man's then condition, and a rash conjecture of a layman as to the outcome of the hurt. Surely, it is not to be seriously contended that the claim agent's guaranty of perfect health in a given short time was relied upon by the appellee in executing the release. The injured man was neither insane nor idiotic, and a ridiculous guaranty of sound health by a rail-

way stock claim adjuster could not mislead or deceive any sane man.

Was there, then, any abuse of professional confidence on the part of the physician by which the patient was misled and deluded into making the settlement? The burden of the complaint of appellee is that the physician did not disclose to him the fact that the railway company's surgeon was his physician, and that he thought the physician was representing him alone in the transaction.

According to appellee's evidence, Dr. Johnston had never been his physician, and, though his wife had, when unmarried, been attended in illness by this well-known medical man, yet, after her marriage with appellee, years before the date of appellee's hurt, as we infer from the number of children born to them, Dr. Johnston had never seen her professionally. He was not appellee's family physician. He was not appellee's chosen and trusted medical adviser. On this particular occasion, Dr. Johnston had been called to see and treat appellee by the compress company, and this the appellee knew, as he testified, and the fees of the physician were to be paid by the compress company, as appellee's evidence clearly shows he also well knew. More than this, the appellee knew that the two offers—first, of $25, and, second, of $50—were propositions sent by the railway company through the physician. Dr. Johnston was not his medium of communicating propositions for settlement to the company, but was the agency through which the railway company was seeking to make a settlement with appellee. Furthermore, it is deducible from the evidence of appellee that he did not rely upon his confidence in Dr. Johnston in making the settlement, for he says himself that when the first offer of $25 was made him by the physician, he declined, on the express ground that he had not conferred with any one on the subject. Or, as he put it: "I have not had no one to confer with no way; haven't even talked to my wife, and am not prepared to give you no answer."

The evidence offered by the appellee in support of his replication is not clear and convincing and indubitable that the release was procured by fraud or misrepresentation, and this it must be before the settlement can be avoided. We must regard the case as a court of equity would a bill filed to cancel a contract on the ground of fraud, and it is impossible to conceive of that court canceling any ordinary contract for fraud on the evidence offered by appellee in the case at bar in support of his effort to avoid this release.

The appellee's case is, as appears from his evidence, a hard one, and excites our sympathy. He is permanently and seriously disabled, we are inclined to believe. He has made what after developments show, perhaps, was an unwise settlement; but he did not rush into it immediately after he was injured, nor did he precipitately accept an offer. He was first offered $25, then, at a later day, $50, and, several days afterward, $75, and, last of all, $100. He had time for deliberation and for conference with others. He finally accepted the last offer, an offer which then seemed not unreasonable, remembering the railway company assumed payment of all his bills incurred during his illness. It now appears that the sum received was not commensurate with the injury suffered; but that in no way affects the present controversy. It is not to be forgotten, we say in conclusion, that the appellee rested on this settlement for nearly a year before bringing this suit.

Hard as the appellee's case appears to be, we cannot open the door to unsettle the faith of men dealing with each other in the binding force of contracts solemnly entered into, by avoiding the effect of this release upon the wholly unsatisfactory evidence of fraud or misrepresentation found in appellee's testimony.

The judgment of the court below will be reversed and the verdict set aside, but, for the reasons already given, the first verdict cannot be re-instated.

*Reversed.*