APONAUG MANUFACTURING CO. *v.* COLLINS.

In Banc. Oct. 24, 1949.

No. 37202 (42 So. (2d) 431)

**Crawley & Ford,** for appellant.

**Guyton & Allen,** for appellee.

**Smith, J.**

This is an appeal from a judgment for compensatory damages in a personal injury action against appellants.

There are several assignments of error, including the complaint that the verdict of the jury in finding for the appellee (plaintiff in the trial court,) with reference to the liability of the defendant (appellant here,) for having failed to use reasonable care in furnishing the plaintiff with a reasonably safe machine, was against the overwhelming weight of the evidence. ■■ ■ At the conclusion of the plaintiff's evidence, the defendant made a motion to exclude and direct a verdict for it, which was overruled. However, instead of electing to stand on this motion and its rejection by the trial judge, the defendant proceeded to introduce evidence in its behalf. Under our decisions, this was a waiver of the point. At the conclusion of all of the testimony, the defendant made no motion for a peremptory instruction, and this failure has a direct effect upon our disposition of the appeal, as will be hereinafter revealed. Furthermore, since we have concluded that the case must be reversed and remanded for another reason, it is not necessary for us to discuss the degree of proof on the merits the appellee was able to attain.

However, the appellant did make a motion for a new trial, which, in our judgment, was incorrectly overruled, but we have concluded to place reversal on only one ground, and that is the manifest failure of the plaintiff to sustain her charge, by clear and convincing proof, that a release signed by her was obtained from her by trick, device and fraud.

The appellee entered into the employ of appellant as a student weaver in October 1945, as shown by the payroll records of the company, and contrary to her contention that it was in February of that year. At the end of six weeks, she was placed in charge of ten looms, although she testified to twenty-eight, which we believe to be unsupported sufficiently in the record. One of these looms, because defective, she claims caused an injury to her, and for it she sued, as stated. According to her, when she came to work on the 2 o'clock p. m. shift,

June 19, 1946, there was a signal on this particular loom that it was out of order, which was disputed by the loom fixer, whom she said she called to repair it. This person is not now in the employ of appellant, and denied this. However, she claimed to have later signalled that the loom had stopped, a number of times, and he fixed it each time, but it would shortly stop again. The loom fixer said she did signal but not several times, and that he found nothing mechanically wrong with the machine, the trouble being either a cut thread or matting of threads, which automatically stopped the machine. She, as a weaver, had been instructed how to tie the threads or untangle the mats, and pull a lever to restart the loom. It was her duty to do this, as testified on behalf of appellant. But, she said that the loom fixer told her a part was worn and that he could not repair it because there was no duplicate in the parts room, which he denied. She also claimed that the superintendent sent her word that she must operate the particular loom, because it had in process a color that was presently needed, even though it might be in bad order. Both of her claims above were disputed by witnesses for appellant, with the showing that if a part were defective and not replaceable by a spare, one could and would have been taken from an idle loom or a loom suspended from use, since there were more than a thousand of them in the plant; and that if there had actually been an insistent, imperative need for that particular color of woven fabric at that precise moment, it would and could have been transferred to and finished on another loom.

Nevertheless, plaintiff testified that as she leaned over the loom to repair the threads so it could be operated at a time it had automatically stopped, as stated ante, suddenly a beam which worked from back to front, and reversed (called a loom lay) started up and struck her in the stomach, causing severe shock and pain and suffering. She denied that her body, beyond the protecting breastplate (being an arrangement to shield the opera-

tor's body), accidentally pushed the lever, but asserted the injury was due to the loom lever's and loom lay's improper functioning. Mechanics testified they thereupon investigated the loom and found nothing wrong with it. They also testified that it was mechanically impossible for the loom lever or loom lay to have caused the accident in the way she described, in her testimony from the witness stand.

She was immediately carried to the office of a physician, who had been elected by the employees of appellant to attend them in such case. Appellee testified that she had a visible bruise across her stomach, and that the doctor made no examination of her. The physician said that there was no visible sign of any contusion or bruise, and evidently was of the opinion that the injury was trivial, because he never gave her a sedative or narcotic to relieve pain; but only citro-carbonate of soda, which had no curative or pain relieving qualities. He then sent her home. Contrary to the doctor's records made at the time, appellee swore that the doctor prescribed some form of dope in capsules, and that an ice pack be placed over her stomach, both of which prescriptions she followed, but, according to her and her husband, she nevertheless suffered all night. Her husband carried her back to the doctor's office the next day, who sent her to the hospital and gave her injections of dope this time, they asserted. The physician stated he sent her to the hospital for observation of developments in view of her claims of pain. When there were no developments during his visits to her there, she was discharged at the end of three days. She and her husband said they went to the office of the medical man every other day thereafter for a few days, while he said they came twice only, and then no more. The whole period was approximately a little more than two weeks.

With the testimony in the case, as set out supra, and its implications, the jury brought in a verdict for appellee in the sum of $3,000, reduced by a remittitur in

the trial court to $1750. One of the errors assigned here is that this award is excessive. We do not find it necessary to pass specifically upon that exact point here in view of the decision we have reached, and set out this evidence only to demonstrate that the settlement between the parties hereto, discussed post, for which she signed a release, was not so grossly inadequate as to shock the conscience and so invalidate the release.

The incident, on which this action is bottomed, occurred June 19, 1946, as stated. On July 8, 1946, appellee gave a signed statement to Miss Newell, the proper employee of appellant to take it, setting out therein information about herself and her version of what happened and the results. Miss Newell is now Mrs. Vandergrift, married and a housewife looking after her home and immediate family. Although her father was at the time of the trial the superintendent of appellant's plant, he was not the superintendent alleged by plaintiff to have ordered her to operate the claimed defective loom. Miss Newell, then Mrs. Vandergrift, was not employed by appellant at the time of the trial; and hence had no real interest in the effect or result of the lawsuit. In this report of the accident appellee declared that the ''shuttle'', and not the ''loom-lever'', was hung, and when she got it out and as she was trying to start the loom up, it started automatically. Furthermore, she said over her signature: ''I was at the left end of the loom and I was leaning over to pull the lay back to the center and in doing so *my side hit the shift lever causing the loom to start up.* The lay of the loom hit me in my stomach.'' (Italics supplied.) She added that the tools were in fair condition, and she did not know the cause of the accident. On August 3, 1946, this report of the accident as signed by appellee, was mailed to appellant's executive, Mr. Sanders, at Jackson, Mississippi.

On August 27, 1946, appellee executed the release in controversy, and which she claimed and testified was obtained from her by trick, device and fraud, but in

our judgment was not supported, as all our decisions hold it must be, by clear and convincing proof; and because the trial jury held that it was, and the trial judge overruled appellant's motion for a new trial because he felt that the verdict was supported by the overwhelming weight of the evidence; we have decided that the judgment must be reversed and remanded for a new trial. In our opinion ██ ██ the overwhelming weight of the evidence in a case might be for a party charging fraud in procuring a release, and such evidence still falls short of being "clear and convincing." The two terms are not synonymous, and ██ ██ a party charging fraud, even if he attain the degree of overwhelming weight of the evidence, its character must be further measured by the test,—is it clear and convincing? The evidence for appellee is neither overwhelming nor clear and convincing in the case at bar, as to the release.

It is not to be assumed from what we have just said that we are deciding that appellee has established the merits of her case, or her version of the circumstance under which the release was obtained, by the overwhelming weight of the evidence or even by successfully carrying the burden of proof. Especially do we disavow any intention to that effect as to the release. In regard to it, we are satisfied appellee never met a simple burden of proof, much less produced overwhelming evidence, and certainly failed to sustain her charge of fraud in its procurement by clear and convincing evidence, which, under the law, she was required to do before she could prevail on that issue. We are, however, dealing only with the release. Therefore, we will briefly review the evidence, including her version, and that of Mrs. Vandergrift's, in connection with the settlement and release.

Mrs. Collins, appellee, was a married woman; she had finished the ninth grade in high school; she had completed her instruction period in six weeks, whereas some others required several months in doing so. Therefore, we feel that it may be safely assumed that she was an

intelligent woman. She signed the report of the accident on July 8, 1946,—the accident having occurred June 19, 1946. She had been thereafter to appellant's office once or twice before the date of the signing of the release, which was done on August 27, 1946. On that morning, she had gone, she said, to see about going to work again. She was informed that the superintendent was out, and that as she started out of the office, Mrs. Vandergrift, (who was then Miss Newell) said "Louise, I want you to go up town with me," to which she assented, as she, too, was headed that way. Thereupon, Mrs. Vandergrift picked up some papers; they got in the car, and went to the office of Mr. Crawley, attorney for appellant, without any information being given to appellee of the particular destination or its purpose of effecting a settlement with her for her injuries. Inconsistently, however, appellee further testified that in the course of the trip she was told by Mrs. Vandergrift that she had some papers she desired appellee to sign in Mr. Crawley's office, showing how the accident occurred; appellee agreed, she said, "if that's all it is." She was not shown the papers, but she did not claim that she asked to see them. She believed what she was told.

They reached Mr. Crawley's office, where the release was signed. The papers were not read to her, Mr. Crawley merely saying to her, according to her testimony, "Well, you understand that this is the way of the accident and how it occurred," and that it was customary to have three copies, adding that "the loom was out of fix and the lay has hit you in the stomach." She believed him, and he, having turned the papers facing her, showed her where to sign, which she did. No copy was given her, nor is it shown she asked for one. Nothing was said about a release, or settlement, and she said had there been she would not have signed at all. The document contained the signatures of attorney Crawley and Mrs. Vandergrift (at that time Miss Newell), as witnesses. She neither requested them to, nor saw them, sign it,

she testified. $57.20 in currency and change was handed to her, as she got up to leave, accompanied by this statement from Mr. Crawley, she said, "Louise, we have some money here, half time up until now that we wanted to give you." She further testified that she accepted it, and went on up town and spent it the same day. She had no corroboration of her evidence.

According to the testimony of Mrs. Vandergrift, appellee came to the office of appellant and they had a conversation about a settlement, and reached an agreement of $57.20, plus doctor's and hospital bills, which was the consideration as actually shown by the release, also. This was on August 15, 1946, the report of the accident had been delayed in its transmission to Mr. Sanders, of appellant, at Jackson, because of the illness of Mrs. Vandergift's father, its superintendent, but it had been mailed on August 3, 1946, so the executive office had it at the time of this conversation between the two women. Appellee was told that approval of the settlement would have to be obtained before it could be consummated, Mrs. Vandergrift testified, and further, that word of the result would be sent her.

On the date of the tentatively agreed settlement, Mrs. Vandergrift wrote Mr. Sanders, requesting that he refer to the July 8th report of the June 19th accident to appellee, stating the terms of the proposed settlement, and asking for authority to make it. In a day or two, she received authority to pay appellee $57.20, and to pay the hospital bill of $16 and the doctor's bill of $15. Word was sent to appellee by her former supervisor at the plant, and she came to the office on the day the release was signed, and settlement was made. On that date, Mrs. Vandergrift wrote Mr. Sanders, enclosing the release, together with statements from the physician and the hospital. It will thus be seen that the version of Mrs. Vandergrift is indubitably corroborated by these record circumstances, although the trial court excluded, erroneously we think, the letters asking for and giving

authority to settle. However, Mrs. Vandergrift was permitted to state that she did receive authority to settle the claim, which was accordingly settled, in compliance with terms of the release as shown by the correspondence. The effect, therefore, was to put into the record a sufficient showing that such authority had been asked and obtained in the absence of the letters themselves.

Before going to Mr. Crawley's office, Mrs. Vandergrift said she had to obtain a requisition for the money with which to pay appellee out of the petty cash. This she did, the requisition reciting that it was for ''full settlement— her accident 6/19/46,'' referring to appellee. Later, in the office of Mr. Crawley, when appellee received and accepted the money, Mrs. Vandergrift wrote a receipt on the side of this requisition, reading ''Received payment as above.'' Appellee, when confronted with this document on cross-examination, at first denied she had signed it but finally and reluctantly admitted that the signature to it was her own.

According to Mrs. Vandergrift, on the date of the alleged settlement, appellee came into the lobby of appellant's office and notified her she was ready to sign the release, whereupon she got in touch with Mr. Crawley and got the voucher for the money out of the petty cash, as stated above. Both of these things having been done, they repaired to the office of Mr. Crawley, who read and explained the release to appellee, telling her fully of its purpose and effect. He thereupon invited questions from appellee, asking her if she understood, and received an affirmative reply. Appellee signed the release, and received the money, signing a receipt, as set out, supra, and declined a ride back to the mill, stating she had some bills to pay. So, she and Mrs. Vandergrift went their separate ways. Six copies of the release were signed by appellee, although she denied having signed more than three, while admitting the signature to all six to be her own.

Mr. Crawley died, and hence could not testify at the trial of the case. The tribute to him stated in the record was without contradiction that he was a good man. As for the testimony of appellee impugning the integrity of the deceased, Mr. Crawley, the trial judge, in an opinion dictated into the record, said he did not believe anything she said which reflected on him.

In August 1947, appellee had still not been reemployed by appellant. During that month, she began to consider bringing this suit for damages, which she shortly did. Before filing it, she went to the office of Mr. Crawley, Jr., which had also been the office of his father, and in which the son was then practicing law. Her purpose was to see what release, if any, she had signed. Mr. Crawley, Jr. frankly showed her the file, which contained a copy of the report of the accident but none of the release. Appellee then went to the office of appellant for the same purpose, but was refused any information, Mrs. Vandergrift stating that she was without authority to reveal the file to her. Thereupon, suit was filed. Appellee, as shown, was thirty-four years old, had finished the ninth grade in high school, and was an intelligent woman. She did not deny that she knew she had signed the report of the accident. Her search for information as to a release disclosed that she remembered having signed some sort of release. As the trial judge stated in the record: "If she knew she hadn't signed a release, she wouldn't have found it necessary to be making any inquiry about it."

Aside from the proof that Mr. Crawley was a good man, and the just inference therefrom,—that he would not attempt to defraud appellee,—from what we have said above, we think it is clear that appellee is convincingly contradicted, and appellant convincingly corroborated by the circumstances as to the release. ■■■ To say the least, appellee failed to establish her claim of fraud in its procurement by clear and convincing proof. This she was under the mandatory duty to do or fail on the issue.

478

On this subject, we have said that where one, injured by a railroad, releases his claim for damages, and, afterwards in an action at law, seeks to avoid the release, he must show by clear and convincing evidence that it was procured by fraud or misrepresentation, such as would authorize its cancellation by a court of equity. Alabama & V. Ry. Company v. Turnbull, 71 Miss. 1029, 16 So. 346. See to the same effect Alabama & V. Ry. Company v. Kropp, 129 Miss. 616, 92 So. 691; and many others in our jurisprudence. Under the subject, Release, 45 Am. Jur. p. 686, Section 21, this is said: "Where no fiduciary or confidential relationship exists, fraud in obtaining a release is not presumed, but must be clearly and distinctly proved by the person who asserts it. Therefore a releasor cannot avoid a release on the ground that it was procured by certain false representations of the releasee's agent, where the releasor's allegations are denied by the agent, corroborated by the subscribing witness to the release."

Furthermore, we have held that whether evidence of fraud charged in a civil case is clear and convincing is ordinarily for the jury, but where it manifestly falls below that standard and is not of such a real and substantial nature that impartial men of sound judgment could reasonably believe it, the judge should direct a verdict for the opposing party. Truckers Exchange Bank et al. v. Conroy, 190 Miss. 242, 199 So 301. In Metropolitan Life Ins. Company v. Hall, 152 Miss. 413, 118 So. 826, 827, we announced that "The prima facie presumption is that all persons act honestly. Fraud is never presumed. He who alleges fraud must prove it by clear and convincing evidence. This is true, both in the courts of law and in the courts of equity." In Martin v. Gill et al., 182 Miss. 810, 181 So. 849, we held that charges of fraud must be supported by clear proof which is more convincing than a mere preponderance of the evidence. Again, in Grenada Auto Company et al. v. Waldrup et al., 188 Miss. 468, 195 So. 491, we re-announced the rule that

a party charging fraud must prove it by evidence which is "clear and convincing." We repeated this holding in Hunt v. Sherrill, an action for fraud and deceit, 195 Miss. 688, 15 So. (2d) 426; and also in Corley v. Myers et al., 198 Miss. 380, 22 So. (2d) 234, 575, 23 So. (2d) 302.

It follows that the action of the trial court in overruling the motion for a new trial on the ground that the verdict of the jury was ". . . in accordance with the overwhelming weight of the evidence," at least so far as it bore upon the issue of fraud in the procurement of the release, was erroneous and also based on the wrong test. In answer to these cases, appellee cites Randolph Lumber Company v. Shaw, 174 Miss. 297, 164 So. 587, wherein the facts are so different that it is not in point here, we think, and, moreover, it does not attempt to abrogate the rule of "clear and convincing" proof.

If, appellant, at the end of all of the evidence for both sides, had asked for a peremptory instruction, been refused, and this action of the trial court been assigned in the motion for a new trial, we would not only have reversed the case, but would have rendered judgment here for the appellant, since the release was valid and appellant was entitled to a directed verdict because of it. But, this was not done, the trial judge was given no chance to rule on such a motion. So, not having been put in error by appellant, we cannot do so here. All that appellant asked for was, after putting on his proof and losing the case, a new trial, and that is all we can grant in this state of the record.

The appellee, as a support to its charge of fraud, makes the contention that the settlement was for such an inadequate consideration as to shock the conscience, but with this we cannot agree. However, in this connection, the testimony of the doctor, selected by the employees themselves and not by appellant, was very interesting and cogent. It positively and certainly refuted the insistence of appellee that the consideration of the release was so inadequate as to shock the conscience,

since he evidently regarded her injuries and pain as so trivial that he prescribed neither sedative nor narcotic, and dismissed her from the hospital at the end of three days. Under Federal regulations he was required to keep a record of all narcotics he dispensed, and from these records he testified. The period of treatment, and the degree of pain, if any, as described by this disinterested physician, was so slight that it might reasonably be inferred from his testimony that appellee was more or less malingering. Appellee cites a number of cases on inadequacy of damages, and of considerations for releases, but none of them, in our judgment, sustain her position on the particular facts and circumstances in the case at bar. Moreover, appellee was of sufficient age and intelligence to know what she was willing to accept, and she did accept what she wanted to, and this she had a right to do.

We do not deem it necessary to discuss the cross-assignment of error filed by appellee, claiming error in the trial court because appellee was required to enter a remittitur, since we do not reach any necessity for so doing in view of what has been written, supra.

The judgment of the circuit court is reversed and the case remanded for a new trial.

Reversed and remanded.