Sarbast JAFF, Individually and d/b/a Soma Agro Industry, Plaintiff-Appellee Cross-Appellant,

v.

CAL-MAINE FOODS, INCORPORATED, et al., Defendants-Appellants Cross-Appellees.

No. 84–4388.

United States Court of Appeals, Fifth Circuit.

Oct. 25, 1985.

Thomas W. Crockett, William I. Gault, Jr., Jackson, Miss., for defendants-appellants cross-appellees.

Merle N. Schneidewind, Stephen T. Cummings, San Diego, Cal., for plaintiff-appellee cross-appellant.

Before RUBIN and REAVLEY, Circuit Judges, and SEAR,* District Judge.

## OPINION

SEAR, District Judge.

This is an action for breach of contract to provide equipment and services for operation of a poultry business in Khorramdarreh, Iran. It was brought in state court in California by the buyers, Sarbast Jaff (Jaff), an Iranian citizen individually and doing business as Soma Argo Industry (Soma), against the sellers, Cal-Maine Foods, Inc., Cal-Maine International, Ltd. (Cal-Maine), also known as Agri International, Inc., and Julian O. Russell (Russell), President of Cal-Maine, all citizens of the United States. It was removed to the United States District Court for the Southern District of California because of the diverse citizenship of the parties,[1] and then transferred to the Southern District of Mississippi as a more convenient forum.[2] The case was tried without a jury by consent of the parties before United States Magistrate John R. Countiss III.[3] The magistrate found that defendants had failed to perform all of their obligations under the contract and that a subsequent release executed by the parties was invalid for failure of consideration. He awarded damages in favor of plaintiff in the amount of $302,156.00 plus costs and interest. We reverse.

Jaff was the sole shareholder and director of Soma and was engaged in farming in Khorramdarreh, Iran. In the Spring of 1978, Jaff decided to expand and modernize his poultry business. He was introduced to Julian Russell by officials of the United States Embassy in Iran. Cal-Maine, which conducted business operations in Iran, was a wholly owned subsidiary of Cal-Maine Foods, Inc., the world's largest producer of eggs and egg products.

In May 1978,[4] Soma and Cal-Maine entered into a "Construction Supervision and Management Contract." The contract required Cal-Maine to select equipment for 18 existing but unequipped poultry houses; purchase the equipment for them; arrange for its shipment "to the complex"; supervise its installation; and, "present" the 18 houses "ready to receive poultry."[5] In addition, Cal-Maine was to prepare a feasibility study for construction of an additional 24 poultry houses with necessary accessory buildings.[6] If Soma decided to proceed with that expansion, Cal-Maine was to assist in obtaining financing for the project; supervise the planning and design of the expansion; purchase all necessary supplies, equipment and materials; and, supervise the construction and equipping to a

---

* District Judge of the Eastern District of Louisiana, sitting by designation.

1. 28 U.S.C. § 1332(a)(2).

(a) The district courts shall have original jurisdiction of all civil actions where the matter in controversy exceeds the sum or value of $10,000, exclusive of interest and costs, and is between—

      *     *     *     *     *     *

(2) citizens of a State and citizens or subjects of a foreign state; ....

2. 28 U.S.C. § 1404(a). Defendants are citizens of the State of Mississippi.

3. 28 U.S.C. § 636(c).

4. The exact day in May on which the contract was executed is not contained in the document. Exhibit P-3.

5. Exhibit P-3, paragraphs 1 through 4.

6. Exhibit P-3, paragraph 5.

status of ready for production.[7] The contract classified these services as "Construction Supervision Services" for which Cal-Maine was to receive a supervision fee of 10% of the cost of equipment purchased as well as its costs for personnel plus a fee of 20% to cover fringe benefits.[8]

Cal-Maine was also to be reimbursed its expenses and paid for its supervision services within ten days of receipt of its invoices. The cost of equipment plus Cal-Maine's 10% supervision fee was to be paid under a letter of credit in favor of Cal-Maine at the time of shipment.[9]

After completion of the construction, the contract provided for management and consultant services to be performed by Cal-Maine which was to then receive the greater of two percent of the gross sales or ten percent of the pre-tax profit for operating the poultry complex.[10]

From July through November, 1978, Cal-Maine shipped eight containers of equipment for the initial 18 poultry houses via Seatrain International, S.A. (Seatrain). In addition to arranging for the shipment, Cal-Maine prepaid the ocean freight from the shipping port to Bandar Shahpour, Iran as well as the inland freight to Khorramdarreh, the site of Jaff's poultry complex. Cal-Maine presented Jaff's bank Seatrain's on-board bills of lading and invoices and was paid for the equipment.[11]

At least six of the eight containers had arrived in Bandar Shahpour by October, 1978. None of the equipment, however, ever reached the site of the complex at Khorramdarreh. Jaff claims the reason to be that Russell refused to make arrangements for the shipment to clear customs and to pay the customs charges. Russell claims that the equipment could not be off-loaded from the vessel because it arrived in the midst of a port strike and while there was a revolution brewing in Iran. In any event, neither party was able to determine the whereabouts of the containers before the revolution forced both Jaff and Russell to flee Iran. Jaff migrated to San Diego and because of the political upheaval in Iran is not free to return. Russell moved first to Sharjah, United Arab Emirates, and then to Kuwait.

Various efforts to locate the containers by Jaff, his brother Nosar, Roy Phillips of Cal-Maine and George Maccarone of Seatrain, followed. Eventually, on October 16, 1979 Maccarone wrote Phillips that the shipping containers had been lost and advised that a proof of claim be filed. Jaff filed a proof of claim but received only $4,000.00.

On November 17, 1979, one month after having been notified that the equipment had been lost, Jaff, Soma, Russell, Cal-Maine and Cal-Maine Foods, Inc. entered into an agreement "in order to define the respective rights, duties and obligations of the parties relative to the ... poultry equipment ..."[12]

In the agreement, the parties purported to release each other from any further liability under the original contract.[13] In addition, Jaff authorized Russell, on his behalf, to "attempt to obtain possession of, or collect damages for the loss or destruction" of the equipment.[14] Jaff agreed to pay Russell a contingent fee.[15]

In early 1980, Seatrain became insolvent and Russell abandoned his search. This suit followed.

Following trial, the magistrate found that Jaff had performed his portion of the agreement but that Cal-Maine had not. He

---

7. Exhibit P–3, paragraphs 6 through 9.

8. Exhibit P–3, paragraph 10.

9. Exhibit P–3, paragraph 11.

10. Exhibit P–3, paragraphs 12 and 13.

11. Cal-Maine rebated to Jaff about 40% of the invoice amount pursuant to a separate agree-

ment to help Jaff avoid Iranian currency export limitations.

12. Exhibit D–19.

13. Exhibit D–19, paragraphs 5 and 6.

14. Exhibit D–19, paragraph 1.

15. Exhibit D–19, paragraph 3.

also found that the November 17, 1979 agreement was not a valid release. Although he refused to find that the release was fraudulently induced as Jaff urged, he found that the agreement lacked consideration because following the agreement, Russell had done little to recover the equipment. We disagree.

■ The parties agree that Mississippi law governs the interpretation of both the original contract and the release agreement.[16] The contract clearly reflected the parties' intent to establish mutual on-going obligations regarding the construction and eventual management of the complex. Just as clearly, the November 17th agreement reflected the parties' intent to release each other from any further obligations. The agreement provides:

> in consideration of Cal-Maine's confirmation that it has no claim of any nature against Jaff arising or resulting from the transaction which is the subject of this agreement, Jaff hereby confirms that he has no claim of any nature for any monies due or to become due from Cal-Maine as a result of the procurement and shipment by Cal-Maine of the equipment which is the subject of this agreement.[17]

Each parties' promised forebearance from asserting any claim against the other constituted sufficient consideration to support the release. *Dedeaux v. Young,* 251 Miss. 604, 170 So.2d 561 (1965); *Covington Cadillac Co. v. South Aire, Inc.,* 242 Miss. 716, 136 So.2d 866 (1962). Each party gave something which it believed was of value. Jaff released Cal-Maine of any obligation arising from the loss of the equipment. Cal-Maine released Jaff of any obligations arising from lost profits to which it would have been entitled. Even if the claims released were doubtful, their release was nevertheless sufficient consideration.

*McGehee v. McGehee,* 227 Miss. 170, 85 So.2d 799 (1956); *Leval & Company v. Caver,* 222 Miss. 400, 76 So.2d 231 (1954).

■ The magistrate did not reach the issue of whether the release was fraudulently induced. If there were a genuine issue of fact regarding Jaff's allegations of fraud, we would be compelled to remand the case for further consideration and findings. In view of the Mississippi standard of proof for fraud and the record below, however, remand is not required.

Mississippi law requires that fraud be established by clear and convincing evidence. *Berkline Corp. v. Bank of Mississippi,* 453 So.2d 699 (Miss.1984); *Alexander v. Meyers,* 219 So.2d 160 (Miss.1969); *Aponaug Mfg. Co. v. Collins,* 207 Miss. 460, 42 So.2d 431 (Miss.1949) (overwhelming weight of the evidence held not to satisfy the requisite burden). In order to establish fraud, Jaff must show that Cal-Maine knowingly made a false material representation with the intent to induce Jaff's reliance and that Jaff had a right to rely on and did rely on the representation in signing the agreement. *Breeland v. Hide-A-Way Lake, Inc.,* 585 F.2d 716 (5th Cir.1978); *Hamilton v. McGill,* 352 So.2d 825 (Miss.1977). In determining whether these elements of fraud exist, we take into account the relative circumstances of the parties, including their respective backgrounds, education and economic position, and the existence of any fiduciary relationship.[18] *Martin v. Winfield,* 455 So.2d 762 (Miss.1984); *Parker v. Howarth,* 340 So.2d 434 (Miss.1976).

Having carefully considered Jaff's citations to the record in support of his claim for fraud in connection with the release, we conclude that the evidence in the record

---

16. R.Vol. I, p. 167.

17. Exhibit D–19, paragraph 6.

18. A consideration of these factors does not weigh in favor of finding fraud or overreaching in the negotiation of the release. Jaff was a successful college educated businessman. Although his English was limited, he had the assistance of a professor who was able to speak English. There is no evidence that Jaff did not fully understand the nature of the agreement. Finally, the parties had no fiduciary relationship, they were engaged in nothing more than an arm's length business transaction.

does not approach the heavy burden required by Mississippi law.[19]

Because we find the November 17, 1979 agreement to be a valid release of all the parties' obligations under the original contract, we do not reach plaintiff's claim for breach of that contract.

For the foregoing reasons, the judgment is REVERSED.

---

**19.** In response to our request, Jaff filed on July 9, 1985 a specification of his allegations of fraud and their references in the record.

Jaff alleges that Russell's statements that he was unable to find the equipment are contradicted by a telex from Russell to James Neeld, counsel for Cal-Maine, allegedly stating that Russell had found the equipment. While the telex is not entirely legible, the argument inconsistently is irrelevant to the issue of fraud in connection with the release. The November 17th agreement states that the parties believed that the equipment was either in Iran or Dubai. There is no showing that this belief (whether or not accurate) was not held by all the parties at the time the release was signed.

Jaff alleges that Cal-Maine had duplicate bills of lading issued in its favor without notifying Jaff. The evidence shows that Jaff willingly surrendered the original bills of lading to Cal-Maine so that Cal-Maine could have duplicates issued in order to transship the goods from Iran.

Jaff alleges that Cal-Maine paid storage charges in excess of $10,000 which had been assessed on the goods. Cal-Maine vigorously disputes this claim. The magistrate made no finding on the issue. Even if the claim were true, however, it would not constitute fraud in connection with the release.

Jaff alleges that James Neeld's letter to Jaff, in which he blames Seatrain for the loss of the equipment, was fraudulent. The Neeld letter does not constitute fraud in connection with the release because the letter is dated March, 1980, several months after the release.

Finally, Jaff alleges that Cal-Maine submitted non-conforming documents to Jaff's bank for payment under the letter of credit. Specifically, he alleges that the letter of credit did not authorize payment for shipments after August, 1978. One bill of lading was issued in November, 1978. Jaff also alleges that under the letter of credit payment was not to be made unless proof that the shipments had been insured was presented. Cal-Maine did not insure any of the equipment. These events occurred in 1978. By the time the release was executed, Jaff was aware of the lack of insurance and the dates on which the equipment was shipped.