# IN THE SUPREME COURT OF MISSISSIPPI

## NO. 2011-CA-01846-SCT

*PHILLIPS BROTHERS, KILBY BRAKE*
*FISHERIES, LLC AND HARRY SIMMONS*

*v.*

*RAY WINSTEAD*

| | |
|---|---|
| DATE OF JUDGMENT: | 09/22/2011 |
| TRIAL JUDGE: | HON. JANNIE M. LEWIS |
| COURT FROM WHICH APPEALED: | YAZOO COUNTY CIRCUIT COURT |
| ATTORNEYS FOR APPELLANTS: | LUTHER T. MUNFORD |
| | ROBERT G. MAYER |
| | WILEY J. BARBOUR, JR. |
| | CHARLES W. WRIGHT, JR. |
| | L. BROOKS HOOPER |
| ATTORNEYS FOR APPELLEE: | DORSEY R. CARSON, JR. |
| | JOHN M. LASSITER |
| | CHRISTOPHER D. MEYER |
| NATURE OF THE CASE: | CIVIL - TORTS-OTHER THAN PERSONAL INJURY & PROPERTY DAMAGE |
| DISPOSITION: | REVERSED; REMANDED IN PART; RENDERED IN PART - 01/09/2014 |
| MOTION FOR REHEARING FILED: | |
| MANDATE ISSUED: | |

**EN BANC.**

**WALLER, CHIEF JUSTICE, FOR THE COURT:**

¶1.     Defendants Phillips Brothers, Kilby Brake Fisheries, LLC, and Harry Simmons seek

review of a $1,724,923 judgment in favor of Ray Winstead for shareholder and employment

claims.  Finding multiple errors, we reverse and render in part; and remand in part.

**Facts & Procedural History**

¶2. In March 2000, Kilby Brake Fisheries, LLC, was formed as a catfish hatchery and farm. An operating agreement was signed by the three members–Harry Simmons, Phillips Brothers, LP, and Ray Winstead. The Kilby Brake operating agreement provided each member a one-third percent ownership stake in Kilby Brake. At the start of the LLC, bank loans were made and signed by all three members as guarantors. There were three loans: one in the amount of $300,300 (for the purchase of inventory), one in the amount of $201,040 (the purchase of equipment), and one in the amount of $300,900 (revolving line of credit to be used for operating expenses). Shortly after Kilby Brake was formed, Phillips and Simmons purchased an adjacent catfish farm ("the Wise Place") to be used to support the Kilby Brake operation. Winstead declined to be a part of the purchase of the Wise Place.

¶3. The members agreed that Winstead would be the hatchery operator and, for his work, he would receive $30,000 per year from Kilby Brake and use of a company truck, and Kilby Brake would pay for his and his family's housing on the farm, utilities, and health insurance. Winstead, as hatchery operator, was subject to the direction of Simmons, serving as the manager under the operating agreement. Simmons, under the Kilby Brake operating agreement, was authorized to carry out the business functions of the hatchery, including borrowing money and check-writing.

¶4. Kilby Brake's records indicated it was profitable for only two of the almost eight years while Winstead was the hatchery operator. Simmons fired Winstead in late 2007.

¶5. In September 2009, Winstead filed a complaint against Kilby Brake, Harry Simmons, Chat Phillips, Simmons Farm Raised Catfish, Inc., Five Mile Fisheries, Inc., and H.D.

2

Simmons Corp. in the Circuit Court of Yazoo County.[1] His complaint was amended to add Phillips Brothers, LP, as a defendant. Winstead alleged that Simmons and Phillips Brothers had failed to pay him his agreed-upon salary, asserting claims of fraud, breach of fiduciary duty, corporate freeze-out, conversion, slander, slander *per se*, and tortious interference with business relations. He also requested an accounting and dissolution of the LLC.

¶6. Along with their answers, Simmons, Phillips and Kilby Brake (Defendants) filed counterclaims against Winstead asserting theft, conversion, usurpation of corporate opportunities, tortious interference with business relations, conversion, theft by deception, breach of contractual and fiduciary duties, and unjust enrichment. They requested replevin and judicial dissolution. The counterclaims alleged that Winstead took Kilby Brake property for his personal use, provided property to others to use, and sold property, including fish products, food products, equipment, chemicals and fuel without authorization, while retaining all profits. The trial court granted Winstead's motion to dismiss the claims of tortious interference with Kilby Brake's business relations and claims that were barred by the three-year statute of limitations.

¶7. Trial commenced in April 2011 and, at the completion, a jury awarded Winstead compensatory damages in the amount of $1,160,000 and punitive damages against Simmons of an additional $100,000. The court also awarded Winstead attorneys' fees and costs in the amount of $464,923, bringing the total judgment against Harry Simmons and Phillips Brothers to $1,724,923. Further, the court awarded post-judgment interest at a rate of eight

[1]Harry Simmons and Phillips Brothers were members of a number of other entities involved in the catfish industry. The partners' other companies also were named as defendants in Winstead's complaint.

percent. Defendants appealed. The jury denied three of Defendants' four counterclaims—theft, unjust enrichment, and breach of fiduciary duty. Kilby Brake prevailed on its replevin counterclaim, and the jury ordered that Winstead return the company truck to Kilby Brake.

¶8. Defendants filed a motion for judgment notwithstanding the verdict (JNOV) or, in the alternative, a motion for new trial, which were denied. Although both parties asked in their pleadings for the LLC to be dissolved, they were unable to agree about the terms of dissolution. In the final judgment, the parties' claims for judicial dissolution were dismissed without prejudice. No issue is made of this dismissal on appeal. Because of the many issues in this case, we will discuss the facts relevant to each issue below.

## DISCUSSION

¶9. The issues raised by the three defendants in this appeal fall into six categories: (1) Whether the admission of testimony regarding an oral agreement for cash contributions violated the parol evidence rule; (2) whether there was sufficient evidence to support Winstead's award for fraud; (3) whether there was sufficient evidence to support Winstead's award for corporate freeze-out; (4) whether there was sufficient evidence to support Winstead's award for breach of fiduciary duty; (5) whether Kilby Brake is entitled to a new trial; (6) whether Winstead met the requisite elements of slander *per se*?

**I.     Whether the admission of testimony regarding an oral argument for case contributions violated the parol evidence rule.**

¶10. Winstead asserted that Simmons and Phillips Brothers had agreed to provide $600,000 in paid-in capital from cash contributions for the purchase of the startup equipment and fish

4

inventory. Over Simmons and Phillips Brothers' objections, the trial court allowed Winstead to testify to this alleged oral agreement because the operating agreement was "silent as to the contributions." Winstead's expert also was permitted to testify, over objections, that he believed it was the intent of Simmons and Phillips to pay $600,000 in capital, out of cash.

¶11.    "Questions concerning the construction of contracts are questions of law that are committed to the court rather than questions of fact committed to the fact finder.*" Facilities, Inc. v. Rogers-Usry Chevrolet, Inc.*, 908 So. 2d 107 (Miss. 2005) (quoting **Miss. State Highway Comm'n v. Patterson Enters. Ltd.**, 627 So. 2d 261, 263 (Miss. 1993)). An appellate court applies a *de novo* standard of review for questions of law. **Starcher v. Byrne**, 687 So. 2d 737, 739.

¶12.    The relevant portion of the Kilby Brake operating agreement at issue is set out as follows:

## ARTICLE VI
### CAPITAL CONTRIBUTIONS AND CAPITAL ACCOUNTS

Section 6.1    Initial Capital Contributions.  As initial capital contributions to the Company, the Members shall contribute the Property more particularly described in Schedule "A".[2]

Section 6.2    Additional Contributions.  Except as set forth in Section 6.1 above, no Member shall be required to make any capital contributions.

¶13.    "The primary purpose of all contract construction principles and methods is to determine and record the intent of the contracting parties." **Royer Homes of Miss., Inc. v.**

---

[2]See Schedule "A," attached as an exhibit to this opinion.

*Chandeleur Homes, Inc.,* 857 So. 2d 748, 752 (Miss. 2003) (citing *Kight v. Sheppard Bldg. Supply, Inc.*, 537 So. 2d 1355, 1358 (Miss. 1989)). In contract construction cases, the court's focus is on the language of the contract. *Royer Homes*, 857 So. 2d at 752 (citing *Turner v. Terry*, 799 So. 2d 25, 32 (Miss. 2001); *Osborne v. Bullins*, 549 So. 2d 1337, 1339 (Miss. 1989)). A court should look to the "four corners" of a contract to determine how to interpret it. *McKee v. McKee*, 568 So. 2d 262, 266 (Miss. 1990). It is well established that "parol extrinsic evidence is not admissible to add to, subtract from, vary or contradict written instruments, contractual in nature, and which are valid, complete, unambiguous and unaffected by accident, mistake or fraud." *Byrd v. Rees*, 171 So. 2d 864, 867 (Miss. 1965). "Our concern is not nearly so much with what the parties may have intended, but with what they said, since the words employed are by far the best resource for ascertaining the intent and assigning meaning with fairness and accuracy." *In re Estate of Fitzner*, 881 So. 2d 164 (Miss. 2003) (citing *Simmons v. Bank of Miss.*, 593 So. 2d 40, 42-43 (Miss. 1992)). If the language in the contract is clear and unambiguous, the intent of the contract must be effectuated. *Rotenberry v. Hooker*, 864 So. 2d 266, 270 (Miss. 2003); *see also Pfisterer v. Noble*, 320 So. 2d 383, 384 (Miss. 1975). "The mere fact that the parties disagree about the meaning of a provision of a contract does not make the contract ambiguous as a matter of law." *Burton v. Choctaw County*, 730 So. 2d 1, 6 (Miss. 1997) (quoting *Cherry v. Anthony, Gibbs, Sage*, 501 So. 2d 416, 419 (Miss. 1987)).

¶14. This Court has said that *"silence alone does not necessarily create an ambiguity as a matter of law." Facilities, Inc. v. Rogers-Usry Chevrolet, Inc.*, 908 So. 2d 107, 115 (Miss. 2005). In *Facilities, Inc.*, this Court found that, although the Court of Appeals held that a

6

lease agreement between the parties was not ambiguous, the Court of Appeals improperly considered extrinsic or parol evidence in the analysis portion of its opinion. *Id.* at 110. We found that, although the lease agreement was *silent* as to whether the bonus rent would apply to new vehicle sales at the subject property, it was *not ambiguous* and, therefore, Rogers-Usry was not required to pay bonus rent for sales that did not occur on the leased property. *Id.* at 115-16 ("It is the *silence, not the language of the* [operating agreement], that has created this dispute. However, silence alone does not necessarily create an ambiguity as a matter of law") (emphasis in original). Further, we noted this concept is not novel and has been adopted in a number of jurisdictions. *Id.*

¶15.    The Kilby Brake operating agreement is clear. It states "no member shall be required to make any capital contributions" except as provided in Schedule A.[3] Nothing is listed in Schedule A. Kilby Brake was financed by the three loans totaling more than $800,000, which Winstead signed for and subsequently renewed as a one-third partner. For more than eight years, Winstead never raised an issue about the capital investment. Winstead's expert testified that it was not unusual to leave capital contributions blank for completion at closing. No amounts were ever filled in or added.

¶16.    Constraining our review to the "four corners" of the document, it is clear the language used in the Kilby Brake operating agreement is not ambiguous. Thus, it was error for the trial court to go outside the operating agreement to interpret the intent of the parties. Because the trial court never should have considered the offer to make cash contributions, the interest-expense-savings portion of Winstead's corporate freeze-out damage award also is without

---

[3]See Schedule "A," attached as an exhibit to this opinion.

7

merit. We thus reverse the judgment of the trial court on its parol-evidence finding as well as the damages awarded and render judgment in favor of Simmons on this portion of Winstead's freeze-out damages. Having limited our review to the admissible evidence, we now address the merits of Defendants' claims.

## II. Whether there was sufficient evidence to support Winstead's award for fraud.

¶17. Winstead's theory of recovery for fraud was based on two claims. The first is that Simmons and Phillips Brothers purchased the Wise Place in their names only, with funds from Kilby Brake. The second is that money was withheld fraudulently from his salary. Winstead was awarded a total of $140,000 for fraud: $90,000 for one-third of the value of the Wise Place and $50,000 for money withheld from his paychecks. Simmons and Phillips Brothers were both found liable and both moved for JNOV, arguing Winstead had failed to prove all of the elements of fraud by clear and convincing evidence or, in the alternative, that the overwhelming weight of the evidence required a new trial.

¶18. The standard of review for the denial of a motion for JNOV is *de novo*. *InTown Lessee Assocs., LLC v. Howard*, 67 So. 3d 711, 718 (Miss. 2011). We consider the facts in the light most favorable to the nonmoving party. *Natchez Elec. & Supply Co., v. Johnson,* 968 So. 2d 358, 361 (Miss. 2007). "'If the facts so considered point so overwhelmingly in favor of the appellant that reasonable men could not have arrived at a contrary verdict, [we are] required to reverse and render.'" *Leaf River Forest Prods., Inc. v. Ferguson*, 662 So. 2d 648, 659 (Miss. 1995) (quoting *Munford, Inc. v. Fleming*, 597 So. 2d 1282, 1284 (Miss. 1992)). We will affirm the denial of JNOV if there is substantial evidence in support of the

8

verdict. *Natchez Elec. & Supply Co.*, 968 So. 2d at 362. "Substantial evidence is information of such quality and weight that reasonable and fair-minded jurors in the exercise of impartial judgment might have reached different conclusions." *Id*. (citations omitted).

¶19. In order to recover for fraud, a plaintiff must prove the following elements: "(1) a representation; (2) its falsity; (3) its materiality; (4) the speaker's knowledge of its falsity; (5) his intent that it should be acted on by the hearer and in the manner reasonably contemplated; (6) the hearer's ignorance of its falsity; (7) his reliance on its truth; (8) his right to rely thereon; and (9) his consequent and proximate injury." *Holland v. Peoples Bank & Trust Co.*, 3 So. 3d 94, 100 (Miss. 2008) (citations omitted). These elements must be proven by clear and convincing evidence. *Bank of Shaw v. Posey*, 573 So. 2d 1355, 1363 (Miss. 1990). Clear and convincing evidence is of such a high order that "this Court held that the 'overwhelming weight of the evidence' falls short of being 'clear and convincing.'" *In the Interest of C.B.*, 574 So. 2d 1369, 1375 (Miss. 1990) (quoting *Aponaug Mfg. Co. v. Collins*, 42 So. 2d 431, 434 (Miss. 1949)).

### A.    *The Wise Place*

¶20. The Wise Place is a catfish farm located adjacent to Kilby Brake. Winstead testified that Simmons informed him that "they had gotten the Wise Place" and that it was his understanding "that, basically, Kilby Brake bought the Wise Place." Simmons testified that he and Phillips Brothers purchased the Wise Place and the equipment thereon individually and allowed Kilby Brake to use it as part of the hatchery operation. He further testified that Winstead was unwilling to join in the purchase because he did not feel that a bank would

9

lend him more money. The deed to the property was dated April 12, 2000, and was recorded in the names of Harry Simmons and Phillips Brothers.

¶21. At trial, Simmons initially testified that the purchase price of the Wise Place was $190,000, however, he later explained that the total purchase price for the land and equipment was $230,000. Phillips also testified that the purchase price for the land at the Wise Place was $190,000, but that the equipment that came with the deal was an additional cost. Simmons and Phillips Brothers permitted Kilby Brake to use the Wise Place, rent free, and even gave the proceeds from the sale of the Wise Place equipment to Kilby Brake. Although Kilby Brake did not pay rent for use of the Wise Place, Kilby Brake spent $78,305.70 to make improvements to the pond walls and access roads to benefit Kilby Brake.

¶22. At the start of the company, Kilby Brake secured three loans from BankPlus, which were signed by all members, totaling $800,000. Simmons testified that they paid $400,000 for inventory and $200,000 for equipment, which left $200,000 in operating capital. A Kilby Brake bank statement from March 2000 was submitted into evidence showing that $610,000 was deposited into the account. Winstead's attorney thoroughly questioned Simmons about the purchase of the Wise Place and the March 2000 bank statement, claiming this is where the $190,000 came from to purchase the Wise Place. Simmons denied this, later testifying that he recalled purchasing the Wise Place with Phillips Brothers using cash.

¶23. The record contains no evidence that Kilby Brake funds were used to purchase the Wise Place. Winstead's forensic accountant, Robert Alexander, testified that *no* Kilby Brake funds were used to purchase the property, and neither Simmons nor Phillips *ever* took any money from the Kilby Brake account, whether salary, dividends, or other distributions. The

deed to the Wise Place was in the name of Simmons and Phillips Brothers and was on record at the Humphreys County Courthouse. Interestingly, the jury form stated Simmons and Phillips Brothers were guilty of a material misrepresentation and all nine elements of fraud but then stated the jury found Simmons and Phillips Brothers not guilty of "misappropriat[ing] and convert[ing] Kilby Brake Fisheries' funds or property. . . ."

¶24. This Court finds that insufficient evidence, much less clear and convincing evidence, was presented to prove the funds to purchase the Wise Place came from Kilby Brake. Further, Winstead's mere assertion that he thought Kilby Brake owned the Wise Place is not enough to carry his burden that he was defrauded by Simmons and Phillips Brothers. We find that the trial court erred by failing to grant Defendants' motion for JNOV for the claim of fraud surrounding the purchase of the Wise Place. Thus, we reverse and render judgment on this issue in favor of Simmons and Phillips Brothers.

### B. Withheld Pay

¶25. The jury ruled Winstead was defrauded by Phillips Brothers and Simmons with regard to withholdings from his paycheck over the course of his employment at Kilby Brake. Whether Winstead was owed money based on the amounts withheld from his paycheck was heavily contested by both sides. Winstead claims improper deductions were taken from his paychecks and he was never paid the amount he was promised. Simmons claims Winstead actually owed Kilby Brake for personal charges and cash advances. Both sides produced documents which were admitted into evidence showing records of payments and deductions. Based on Winstead's stated $30,000 annual salary, Alexander calculated that Winstead was

11

owed $50,000 in withheld pay over eight years. The jury found Phillips Brothers and Simmons liable for $25,000 each.

¶26. In *Natchez Electric Supply Inc.*, the plaintiff was seeking to recover on an open account. Despite some uncontroverted charges by the defendant, the jury returned a defense verdict with no recovery for the plaintiff. Because the record contained undisputed evidence of one party's obligation to pay another, this Court held "no reasonable and fair-minded juror in the exercise of fair and impartial judgement" could find the obligating party owed absolutely nothing. *Natchez Elec. & Supply Co., Inc.,* 968 So. 2d at 363. The case at bar bears striking similarities.

¶27. In the record we find Winstead admitting to making personal charges on his Kilby Brake account for some items that were indisputably personal, such as multiple deer-rifle scopes, dog food, and hunting accessories. When asked if the purchase of a "Gobbler's Lounge," used for turkey hunting, was for Kilby Brake, Winstead responded, "[n]o sir. That would be a personal item for me." It was further undisputed that Winstead charged Kilby Brake for gasoline used at his father's hunting camp in Durant. Winstead's damages for lost pay were based on testimony that money was taken out of all his paychecks; however, payroll records indicate that Winstead was actually paid in excess of his $30,000 annual salary for four of his eight years with Kilby Brake. What is more, Winstead admitted he had received cash advances on his paycheck and that money subsequently would be taken out to repay the advances. Because fault was apportioned between Phillips Brothers and Simmons, we address both separately.

12

¶28. As to Phillips Brothers, we can find no proof of any involvement in the decision-making process regarding the execution of Winstead's checks. Contractually, Simmons was the manager and supervised Winstead. The only testimony in the record regarding Winstead's salary was between Simmons and Winstead. Further, all actions on Winstead's pay checks, including any deductions, were made by Simmons and his bookkeepers, not by Phillips Brothers. Winstead even testified that he and Phillips had very little contact, and when they did, they "didn't discuss the farm a whole lot." Nothing in the record indicates Phillips Brothers ever made a representation to Winstead regarding his pay at all. Thus, there is no evidence at all that Phillips Brothers fraudulently withheld pay from Winstead's salary. We therefore reverse and render judgment in favor of Phillips Brothers.

¶29. With regard to Simmons, Winstead admitted at trial that he knew deductions were taken from his paycheck for cash advances and for personal charges he made on his Kilby Brake account. Although Winstead disagreed that some of the charges were personal in nature, there was no dispute that he was aware Simmons was making deductions. We find no clear and convincing evidence in the record that any pay shortage which may have occurred was caused by a fraudulent representation made by Simmons upon which Winstead relied. Thus, we reverse the judgment against Simmons for fraud with regard to withheld pay.

¶30. However, Kilby Brake may be liable to Winstead for any improper deductions from Winstead's pay that may have occurred, or Winstead may be liable to Kilby Brake if it is shown he still owes money to Kilby Brake for charges made on his account. We find Winstead's own testimony, coupled with other evidence in the record, provides

13

overwhelming evidence, based upon which no reasonable and fair-minded juror in the exercise of fair and impartial judgment could award Winstead the full amount that he alleged was taken from each of his paychecks.

¶31.    In addition, for reasons discussed below, we reverse and remand this issue to the trial court for a new trial to determine any amounts Kilby Brake may owe Winstead or vice versa.

> **III.    Whether Winstead proved the requisite elements of corporate freeze-out.**

¶32.    As early as 1913, this Court used the term 'frozen out' when it held that a chancery court could appoint a receiver for a corporation to wind up the business at the insistence of minority stockholders "when it shall appear that by gross mismanagement . . . the rights of the stockholders . . . are being put in jeopardy." ***Brent v. B.E. Brister Sawmill Co.***, 60 So. 1018, 1022 (Miss. 1913).   Since that time, Mississippi courts began to recognize freeze-out[4] as a distinctly individual and direct cause of action, separate from a derivative action. *See, e.g.,* ***Bluewater Logistics, LLC v. Williford***, 55 So. 3d 148 (Miss. 2011)***; Missala Marine Serv., Inc. v. Odom***, 861 So. 2d 290 (Miss. 2003); ***Fought v. Morris***, 543 So. 2d 167 (Miss. 1989); ***Cook v. Wallot***, 2013 WL 1883533 (Miss. Ct. App. May 7, 2013); ***Knights' Piping, Inc., v. Knight***, 123 So. 3d 451 (Miss. Ct. App. 2012), *cert. denied*, 2011-CT-00409-SCT (Oct. 3, 2013).  This Court recognized in ***Fought v. Morris*** that "the distinctive characteristics and needs" of closely held corporations made them different from traditional corporations. ***Fought v. Morris***, 543 So. 2d 167, 169 (Miss. 1989).

---

[4]Other jurisdictions use the term "squeeze out."

14

¶33.   A closely held corporation is a "business entity with few shareholders, the shares of which are not publicly traded." *Fought v. Morris*, 543 So. 2d 167, 169 (Miss. 1989). This Court has held that limited-liability corporations with few members resemble closely held corporations. *See Bluewater Logistics, LLC v. Williford*, 55 So. 3d 148, 161 (Miss. 2011). Minority shareholders in closely held corporations are particularly vulnerable, because they usually lack the control the majority has and there is seldom a fair market available for selling their shares. *Fought*, 543 So. 2d at 170 (citing *Orchard v. Covelli*, 590 F. Supp. 1548, 1557 (W.D. Penn. 1984); *aff'd* 802 F.2d 448 (3rd Cir. 1986)). Thus, if a dispute arises between the minority member and the majority, it is usually the case that a "minority shareholder can neither profitably leave, nor safely stay with, the corporation." *Fought*, 543 So. 2d at 171.

¶34.   Because of their size, membership in closely held corporations resembles that of a partnership rather than a traditional corporation with directors and stockholders. In its most classic form, a freeze-out of the minority shareholders by the majority occurs when the majority purposefully denies the minority member from sharing proportionally in corporate earnings or gains. This could be accomplished by a number of techniques. For example, the majority could refuse to declare dividends, pay themselves exorbitant salaries, or sell corporate assets to themselves at inadequate prices. *See* F.H. O'Neal and R. Thompson, *O'Neal's Oppression of Minority Shareholders* § 3.02 (2d ed. 1985). The freeze-out cause of action, therefore, addresses the central problem: the majority, through its right of control, intentionally reduces or eliminates the minority shareholder's right to corporate earnings or gains coupled with virtual inability of the minority member to withdraw or sell.

15

¶35. Although the jury instructions used at trial in the case before us state there are "elements" to the corporate freeze-out cause of action, no specific elements were set out. This Court previously has said that "[c]orporate freeze-out is an intentional tort that is committed with *willful* and *wanton* disregard for the right of the shareholder who is frozen out." *Missala Marine Serv., Inc. v. Odom*, 861 So. 2d 290, 295 (Miss. 2003) (emphasis added); *Bluewater*, 55 So. 3d at 163 (upholding chancellor's finding that willful and grossly negligent breach of the operating agreement constituted freeze-out). Recognizing the problems inherent in close corporations, the *Fought* Court held that majority shareholder actions in these close corporations must "be 'intrinsically fair' to the minority interest." 543 So. 2d at 171 (*overruling* **Ross v. Biggs**, 40 So. 2d 293 (1949)). The Court went on to define expressly the relationship between those in control and minority members, stating "[d]irectors and officers of a corporation stand in a fiduciary relationship to the corporation and its stockholders. These duties include exercising the utmost good faith and loyalty in discharge of the corporate office." *Id*. (citations omitted). We noted recently that the *Fought* rationale "applies with equal force" to limited-liability companies. *Bluewater Logistics, LLC v. Williford*, 55 So. 3d 148, 161 (Miss. 2011).

¶36. Using traditional elements for an intentional-tort claim and reviewing the above-discussed cases, we find that, in order to prove a claim of corporate freeze-out, the plaintiff must establish: (1) the existence of a legally defined duty owed to or right of a minority shareholder arising out of his or her ownership interest in a corporation; (2) the intentional or willful breach of that duty by the majority or controlling shareholder(s); (3) that the breach proximately caused plaintiff's direct injury; and (4) the fact and extent of injury. *See*

16

*generally* Prosser & Keeton, *On the Law of Torts* § 30 (5th ed. 1984). When we evaluate the duties and the alleged breach of these duties, we will look to the parties' agreements and applicable state law. In the case of Kilby Brake, LLC, that would be applicable caselaw, the Kilby Brake operating agreement, and the March 2000 version of the Mississippi Limited Liability Company Act. *See* Miss. Laws Ch. 402, §§ 1-87, *repealed by* Revised Mississippi Limited Liability Company Act, 2010 Miss. Laws Ch. 532, § 1, eff. Jan. 1, 2011. *See also* Miss. Code Ann. §§ 79-29-101 to 79-29-1317 (Rev. 2013).

¶37. In his argument for freeze-out, Winstead alleged Simmons and Phillips Brothers took actions to exclude Winstead from his ownership interest in Kilby Brake without justification and in willful disregard of Winstead's rights. Winstead's amended complaint states this conduct did not "allow him to in any way participate as a true managing shareholder during his eight years with Kilby Brake." In support of this claim, Winstead argued Phillips and Simmons did not make alleged cash contributions to start the LLC; they misappropriated funds from Kilby Brake; Simmons made detrimental loans for the company without his consent; and Simmons did not allow him to inspect the company books. After he was fired as hatchery operator and moved off the farm, Winstead claimed Simmons and Phillips Brothers mismanaged Kilby Brake to his detriment. The jury found only Simmons guilty of freezing out Winstead.

¶38. As noted above, we found the alleged promise of cash contributions inadmissable and that Winstead had failed to prove Simmons or Phillips Brothers committed fraud by misappropriating funds from Kilby Brake; thus, these arguments as a basis for his freeze-out claim are without merit. The only remaining claims by Winstead are that Simmons

17

improperly fired him, made detrimental loans to the LLC, refused to share financial records with Winstead, and that Simmons and Phillips Brothers mismanaged Kilby Brake after he was fired in 2008. Thus, we look to see if these claims give rise to a cause of action for corporate freeze-out.

### 1. *Participation as a Managing Shareholder*

¶39. The Kilby Brake operating agreement named Harry Simmons as manager. It stated that Simmons, as manager, had "full and complete authority, power and discretion to manage and control the business, affairs, and properties of [Kilby Brake]. . . ." Further, the operating agreement gave Simmons alone the power to acquire property from any person, to borrow money from banks or other members of Kilby Brake on the terms Simmons deemed appropriate, control the business affairs of the company and to make "all decisions regarding those matters." Winstead admitted at trial he signed the operating agreement and understood all of the terms. Although Winstead asserted he "managed" the day-to-day operations, he admitted he was not named as a  manager of Kilby Brake anywhere in the operating agreement and that his title was hatchery operator. Simmons never needed Winstead's permission to borrow money on behalf of Kilby Brake. Further, it  is evident from the record that, had Simmons not borrowed the money from his other entities, Kilby Brake would have ceased business operations. When asked whether Simmons had the authority as manager to borrow money to be sure that payroll was made, Winstead answered affirmatively.

¶40. We find nothing in the record that would lead to the conclusion that Winstead could participate in Kilby Brake as a managing shareholder. Further, Simmons, as the only manager of Kilby Brake, did not use his control of Kilby Brake to violate any terms of the

18

operating agreement, thereby breaching the duty he owed to Winstead. Thus, Winstead's argument that he was frozen out of the LLC because he was denied participation as "a true managing shareholder" in the company is without merit.

### *2. Winstead's Termination as Hatchery Operator*

¶41. Although many commentators point to being fired by management as possible evidence a minority member in a closely held corporation has been frozen out, the Fifth Circuit has held that in employment-at-will states like Mississippi, nonmanaging members of a closely held corporation do not have "fiduciary-rooted entitlements to their jobs." ***Hollis v. Hill***, 232 F. 3d 460, 470 (5th Cir. 2000). *See also* ***Knights' Piping, Inc. v. Knight***, 123 So. 3d at 459 (Miss. Ct. App. 2012) ("a majority shareholder does not breach his fiduciary duty when he terminates a minority shareholder if he has 'acted pursuant to a legitimate business purpose.'"). There is nothing in the Kilby Brake operating agreement that could be construed as guaranteeing Winstead employment with Kilby Brake. Further, there was certainly enough evidence in the record to suggest Simmons was acting pursuant to a legitimate business purpose in firing Winstead.

¶42. Simmons had designated authority as manager to terminate Winstead. Though not required, Simmons had several arguable causes to fire Winstead. Winstead made several personal charges on his Kilby Brake account, even after he was told not to. Winstead used Kilby Brake employees, while they were being paid by Kilby Brake, to make improvements to his deer camp and to work in his father's ham store during the holidays. Kilby Brake equipment also was used to make improvements to Winstead's deer camp. The survival ratio of fish was around forty to fifty percent under Winstead and increased to seventy-five percent

after he left the hatchery. Most importantly, the business was profitable for only two of the eight years Winstead ran the day-to-day operations at the hatchery. Thus, we find Simmons presented sufficient evidence to show he acted pursuant to a legitimate business purpose, and Winstead's firing did not, by itself, constitute a freeze-out of his interest.

### 3. *Inspection of Kilby Brake Finances*

¶43. The Kilby Brake operating agreement states that every member, at their own expense, "shall have the right to inspect, copy, and audit [Kilby Brake's] books and records at any time during normal business hours without notice to any other member or the manager." It also states each member "shall be furnished [with] . . . a copy of the balance sheet of [Kilby Brake]" for each accounting period. The records for Kilby Brake all were held at Kilby Brake's principal place of business, which was Simmons's office in Yazoo City.

¶44. The record shows Simmons proposed that either he or Winstead leave the company in mid-to-late 2007. Winstead alleged that he was interested in purchasing Kilby Brake, but that Simmons failed to provide him with appropriate company financial information that he needed to obtain a loan from a bank. Simmons testified he could not recall the last time that he had sent a balance sheet to Winstead and he doubted that he had sent one since Winstead moved off the farm in January 2008. He further admitted that Winstead remained a member of the LLC, was entitled to the records, and that he continued to send them to Phillips Brothers. However, Simmons delivered 3,500 pages of financial documents relating to Kilby Brake to Winstead's accountant in Canton in June 2008.

¶45. Winstead never presented any evidence to show he was denied access to Kilby Brake's offices and records or that he even attempted to "inspect, copy, and audit" the

20

records at his own expense, which, under the operating agreement, he had a right to do without notice to Simmons. However, as manager and keeper of the records, Simmons also had a duty under the operating agreement to furnish his other partners with balance sheets for each accounting period, which he admittedly did not do for Winstead once he was fired.

¶46. Although Simmons arguably breached his duty to Winstead by not providing the balance sheets to him, Winstead did not present any evidence on how these acts damaged him. The purpose of trying to obtain the financial documents from Simmons was to try and get financing to purchase Kilby Brake. Winstead had a right under the operating agreement to inspect and copy Kilby Brake's books without Simmons's permission. And Simmons eventually delivered the voluminous documents to Winstead's accountant prior to filing suit; thus, we find this claim to be without merit.

#### 4. *Mismanagement in 2008*

¶47. Winstead's claim for mismanagement was submitted to the jury in the same instruction as his freeze-out claim. Winstead received damages on his mismanagement claim in both his award for freeze-out and breach of fiduciary duty. The jury instruction stated that, to prove a claim for mismanagement, "Winstead must show by a preponderance of the evidence that during his corporate freeze-out, Harry Simmons and Phillips Brothers made decisions, purchases, or acquisitions without his consent and that *these actions devalued the business, and in turn, Plaintiff's ownership interest*." (Emphasis added.) Winstead's argument alleges Simmons's mismanagement of Kilby Brake caused a lack of corporate gains and devalued his interest. Thus, it clear from his amended complaint and the jury instruction at trial that these allegations are better viewed as a derivative claim on behalf of

21

Kilby Brake and not a direct cause of action for corporate freeze-out. *See Mathis v. ERA Franchise Systems, Inc.,* 25 So. 3d 298, 303 (2009) ("[I]n determining whether the action belongs to the corporation or the individual, the focus of the inquiry is whether the corporation or the individual suffered injury.").

¶48.    In the case *sub judice*, Winstead presented a number of claims that were derivative because he sought relief on behalf of Kilby Brake, and his injury was based on his ownership in the company.  This Court requested supplemental briefing on the issue of whether it was error for the circuit court to allow the claims to proceed without making a determination of whether the "*Murray* exceptions[5]" applied, which would permit Winstead to bring the derivative claims in a direct action. *See Derouen v. Murray*, 604 So. 2d 1086, 1091 (Miss. 1992).

¶49.    Although the trial court did not apply the *Murray* exceptions, Defendants never challenged whether Winstead should be permitted to bring the derivative claims in a direct action; therefore, we find the derivative claims were tried by implied consent, and the pre-trial procedural requisites that apply in derivative actions were waived. *See id.*  We also find that the trial court was not required to consider, *sua sponte*, whether Winstead was entitled

---

[5] The Murray exceptions allow for derivative claims to be tried as direct actions if the trial judge finds that doing so will not: "(i) unfairly expose the corporation or the defendants to a multiplicity of actions, (ii) materially prejudice the interests of creditors of the corporation, or (iii) interfere with a fair distribution of the recovery among all interested persons." *Derouen v. Murray*, 604 So. 2d 1086, 1091 n.2 (Miss. 1992).

to bring the derivative claims as a direct action; therefore, the trial court did not err in failing to address the issue.

¶50.    Alabama, like Mississippi, has held that managers in a closely held corporation owe a duty to act fairly to minority interests. *See **Burt v. Burt Boiler Works, Inc**.,* 360 So. 2d 327, 331 (Ala. 1978). We find persuasive the statement of the Alabama Supreme Court that the freeze-out cause of action "is not a panacea for any and all conduct undertaken . . . that could be deemed 'unfair' to the minority." **Stallworth v. AmSouth Bank of Alabama**, 709 So. 2d 458, 468 (Ala. 1997). "[A] minority shareholder cannot parlay a wrong committed primarily against the corporation, which gives rise to a derivative claim only, into a personal recovery of damages under a squeeze out theory by simply stating the injury to the corporation is also 'unfair' to him as well." ***Id.*** at 467. Even though we find this language to be persuasive, Winstead claimed the mismanagement of Kilby Brake factored into his freeze-out. Thus, we review this claim in light of the elements we have cited above for corporate freeze-out, which necessarily include proving the conduct complained of was willful and wanton and that it proximately caused individual damages.

¶51.    Winstead argued at trial and in his brief that, after he was fired, "Simmons undertook activities which negatively affected Kilby's financial sustainability and further devalued Winstead's interest." Winstead presented evidence that, in the year following his term as hatchery operator, Kilby Brake's sales decreased by seventy-six percent, from $756,451.64 in 2007 to $181,146.44 in 2008. Winstead's expert, Alexander, testified that, while Winstead was operator, Kilby Brake's sales consistently were close to $775,000 per year. Alexander

23

further testified that, although the economy was bad, the economy was not the cause of the nearly eighty-percent decline in sales. In fact, Kilby Brake's sales were back up in 2009.

¶52. None of the parties disputes that sales were low in 2008 and, of course, each side blames the other. Simmons testified that sales were low because there were no fish in 2008 and attempted to show that Winstead was responsible for the missing fish by either taking them or mismanaging the farm. Members of Kilby Brake's staff testified that, when the ponds were seined in 2008, there was a remarkably low number of fish. However, evidence showed that the seining and feed expenses in 2008 were higher than they were in 2007. Simmons testified this was because he had to restock the ponds to replace the fish that were missing. Winstead argued that the increase in food and seining costs indicated there were fish at Kilby Brake that were not reported. In sum, a sharp dispute exists in the record as to what happened to the fish.

¶53. A number of witnesses testified that if Winstead had moved the millions of missing fish, someone would have known. In fact, testimony was presented that it would be nearly impossible to move the fish in the night and that moving the fish would require a crew of six men, two tractors, a seine and reel, and a boat to move a million fish. However, there was also testimony that large amounts of "swim-up fry" could be moved in a standard ice chest. Alexander stated that he could not testify that the defendants caused the drop in sales; however, he testified that the sales should have occurred if the parties had carried on normal business in Winstead's absence.

¶54. To carry his claim for corporate freeze-out, Winstead was required to demonstrate that Simmons intentionally and willfully used his control of Kilby Brake in 2008 in a way

24

that harmed Winstead individually. We find Winstead failed to prove that Simmons "willfully and wantonly" mismanaged Kilby Brake in a manner that harmed Winstead alone.

### 5. *Conclusion on Corporate Freeze-out*

¶55. Taken as a whole, Winstead failed to prove that he was frozen out of Kilby Brake by Simmons. The record does not indicate that Simmons used his position in control of Kilby Brake to breach a duty he owed to Winstead by denying him his proportional share of any corporate benefits. The reality is the record does not reflect any corporate gains whatsoever. Winstead's expert testified that neither Simmons nor Phillips Brothers ever received any payment from Kilby Brake in the form of salary, dividends, or any other distribution. None of the actions undertaken by Simmons, which Winstead might have felt to be unfair to him, circumvented the powers delegated to Simmons under the Kilby Brake operating agreement. When viewing Winstead's complaints for freeze-out in light of the agreements of the parties and applicable law, we find Simmons did nothing to willfully breach the duty he owed to Winstead. Therefore, for the reasons stated above, we reverse and render the judgment of corporate freeze-out against Simmons.

### IV. Whether Simmons and Phillips Brothers breached a fiduciary duty they owed Winstead.

¶56. The jury found both Simmons and Phillips Brothers breached a fiduciary duty they owed to Winstead and awarded him $395,000, being two thirds of Alexander's valuation of the missing fish sales in 2008 due to mismanagement. Simmons and Phillips Brothers argued first that they did not breach a duty owed to Winstead or, in the alternative, Winstead's damages were speculative and amounted to a double recovery. Winstead counters that a

plaintiff who proves breach of a fiduciary duty is entitled to the damages incurred as a result of the breach.

¶57. In his amended complaint, Winstead argued Simmons and Phillips Brothers "negligently, carelessly, and intentionally failed to perform their duties as . . . managing officers of Kilby Brake so that the assets of Kilby Brake . . . were mismanaged, wasted, diverted to and converted by the defendants. . . ." A breach of fiduciary duty owed to Kilby Brake should be separated from Winstead's corporate freeze-out claim, which is an individual claim for Simmons's intentional breach of the duty owed directly to Winstead that caused him personal damages, separate and apart from any damages to Kilby Brake. *See Fought*, 543 So. 2d at 171 ("'any attempt [by the majority] to squeeze out a minority shareholder must be viewed as a breach of his fiduciary duty . . . .'") (quoting *Orchard v. Covelli*, 590 F. Supp. 1548, 1557 (W.D. Penn. 1984), *aff'd* 802 F.2d 448 (3d Cir. 1986))). By contrast, a claim that Simmons breached his fiduciary duty through mismanagement or dissipation of corporate assets belongs to the corporation because the wrong necessarily damages the corporation and damages Winstead only derivatively.[6] *See Mathis*, 25 So. 3d at 304.

¶58. This Court held in *Fought* that directors and officers in a closely held corporation stood in a fiduciary relationship with the corporation and its members. *Fought*, 543 So. 2d

---

[6]We make this distinction to emphasize that the corporate freeze-out cause of action is distinct from a general breach of fiduciary duty because of the injury involved. Indeed, if a plaintiff proves he or she has been intentionally frozen out, that cause of action would also be the support for an award of personal damages for a breach of fiduciary duty. However, if the wrong directly damages the corporation and its assets from waste, conversion, and mismanagement, the claim is the corporation's.

26

at 171; *see also* **Bluewater**, 55 So. 3d at 161 (holding the **Fought** rationale "applies with equal force" to limited liability companies). Before we look to any common-law standards of care, we look to the agreement of the parties. The Kilby Brake operating agreement and **Fought** lead us to conclude that Simmons, as manager, owed a fiduciary duty to the other members of Kilby Brake. However, the operating agreement also indemnified Simmons from any actions he took on behalf of Kilby Brake as long as he "conducted himself in good faith" and reasonably believed "his conduct was in [Kilby Brake's] best interest." Thus, for Winstead to succeed on his claim that Simmons's mismanagement of Kilby Brake in 2008 breached the fiduciary duty Simmons owed Kilby Brake, he must first establish that Simmons was at the very least in breach of the Kilby Brake operating agreement. Because Simmons and Phillips Brothers both were found to have breached the duties they owed to Winstead, we discuss them separately.

¶59.   It is clear from the record that Winstead ran the day-to-day operations at the farm. After he was fired, Simmons took over this responsibility and hired a new hatchery operator, Dan Bradshaw. Importantly, Phillips Brothers was never involved in decision-making in the day-to-day operations of Kilby Brake. There is no proof that any employee from Phillips Brothers visited Kilby Brake at the time the fish went missing or that any fish were moved to property in which Phillips Brothers had an interest. If anything, the damages resulting from the mismanagement of Kilby Brake in 2008 were detrimental to the Phillips Brothers' one-third interest in the company as well. Although as co-members of Kilby Brake, each party owed a fiduciary duty to the other, Winstead presents no evidence that this duty was

27

breached by Phillips Brothers with regard to the mismanaged assets in 2008. Thus, we reverse the jury's judgment on this claim and render a decision in favor of Phillips Brothers.

¶60. Simmons, as manager of Kilby Brake, owed a duty to Winstead even after he was fired. As noted above, both parties presented plenty of evidence and conjecture as to what caused the missing fish sales in 2008. However, as will be discussed below, we find prejudicial error in the trial court's decisions to prevent Kilby Brake from discovering and cross-examining Winstead on certain financial items that will necessitate a new trial on whether Simmons breached a fiduciary duty he owed to Winstead. Because we also find error in Winstead's damages for breach of fiduciary duty, we discuss those first.

### A. Damages for Breach of Fiduciary Duty

¶61. Winstead received one third of the value of his interest in Kilby Brake as calculated by his expert in his damages for corporate freeze-out.[7] This calculation included one third

---

[7]Alexander calculated the value of Kilby Brake as follows:

| KILBY BRAKE VALUE AT 9/30/09 | | | |
|---|---|---|---|
| Initial equity investment | 600,000 | | |
| Cumulative interest exp savings to 9/09 | 459,303 | | |
| Missing sales from 2008 | 591,191 | <> | See separate damage calculation |
| "But for" Value at 9/09 | $ 1,515,534 | | |
| Value for 1/3 ownership interest | $ 505,178 | | Ray Winstead's ownership interest |

| Adjustment for Inventory value increase | | | |
|---|---|---|---|
| Unadjusted inventory at 9/09 | 1,375,589 | | |
| Price increase - 25% | 343,897 | | |
| Inventory valued at current prices | 1,719,486 | <> | Revised inventory value |

| KILBY BRAKE VALUE WITH INVENTORY AT TODAY'S PRICES | | | |
|---|---|---|---|
| Kilby Brake value from above | 1,515,534 | | |
| Price adjustment | 343,897 | | |
| "But for" value at today's prices | 1,859,432 | <> | Revised Kilby Brake value |
| Value for 1/3 ownership interest | $ 619,811 | <> | Ray Winstead's ownership interest |

of the value of the missing fish sales from 2008. Winstead received the other two-thirds of the value of the missing fish sales in his damages for breach of fiduciary duty. Due to the numerous errors in Winstead's expert's valuation of what Kilby Brake was worth and the amount of the missing fish sales and because Kilby Brake also was improperly limited in its discovery and cross-examination of Winstead as discussed in Issue V *supra*, we must reverse and remand for a new trial with regard to any breach of fiduciary duty.

¶62. To begin, Alexander erroneously used the alleged promise of cash contributions at the formation of the LLC and cumulative interest savings to help determine a faulty starting value of Kilby Brake addressed in Issue I *supra*. In addition, Alexander calculated the price of the mismanaged assets, being the missing fish sales in 2008, to be $591,191 and added this number into his total valuation of Kilby Brake. Because we reverse and render the findings of the trial court on the alleged cash contributions and cumulative interest expense savings, the only damages left to assess are the damages for the missing fish sales.

¶63. Winstead was required to provide substantial proof of damages that he suffered so the jury could have a reasonable basis to assess his loss. *Missala Marine*, 861 So. 2d at 294. This Court has held that the plaintiff has the burden of proving any amount of damages with reasonable certainty. *Adams v. U.S. Homecrafters, Inc.*, 744 So. 2d 736, 740 (Miss. 1999). However, this Court also has noted that "a measure of speculation and conjecture attends even damage proof all would agree reasonably certain." *Wall v. Swilley*, 562 So. 2d 1252, 1256 (Miss. 1990). This Court has stated that it will not overturn a jury's verdict unless no reasonable juror could find damages in the amount that the jury awarded. *Missala Marine*

*Services*, 861 So. 2d 290, 295 (Miss. 2003) (citing ***Wal-Mart Stores, Inc. v. Johnson***, 807 So. 2d 383, 389 (Miss. 2001)).

¶64. Alexander testified that, in the year after Winstead left the hatchery, fish sales were seventy-six percent lower than they had been throughout the company's existence. He opined that the low sales indicated that either Kilby Brake was mismanaged in 2008, or that the sales were under reported by Simmons and Phillips Brothers. To reach the value of the missing fish sales, Alexander found the difference between the average of the gross sales that occurred in 2007 and 2009 versus the gross sales that occurred in 2008: a $591,000 difference. To get to $591,000, Alexander also added a speculative twenty-five percent increase to the price of fingerlings, thus increasing the value of the assets. However, this price increase took place in 2011, long after Winstead filed suit to dissolve Kilby Brake in 2009. Winstead was awarded one-third of Alexander's valuation of the missing fish sales in his corporate freeze-out damages and the other two thirds of this value in his breach-of-fiduciary-duty damages, arguing Simmons and Phillips Brothers received a disgorgement of profits from their breach.

¶65. There are several problems with Alexander's valuation of the mismanaged assets which require a new trial on these damages. To calculate lost profits as damages, the lost profits a party must prove are the "net profits as opposed to gross profits." ***Ballard Realty Co., Inc., v. Ohazurike***, 97 So. 3d 52, 62 (Miss. 2012) (quoting ***Lovett v. E.L. Garner, Inc***., 511 So. 2d 1346, 1353 (Miss. 1987)); ***Puckett Machinery Co. v. Edwards***, 641 So. 2d 29, 37 (Miss. 1994) ("[T]his Court has held that in calculating the loss of profits, the loss to be calculated is that of net profits, not gross profits."). "To ascertain net profits, a party must

30

deduct such items as overhead, depreciation, taxes and inflation." ***Lovett***, 511 So. 2d at 1353. Alexander testified that he added the $591,000 into the value of Kilby Brake "to account for those fish that should have been there but have not been sold." However, his valuation of the total amount of lost profits from missing fish sales failed to account for items such as overhead, labor, taxes, or debt. Indeed, the valuation simply calculated the gross amount of missing fish sales.

¶66. Further, Winstead filed suit in September 2009 for, among other things, dissolution of Kilby Brake. In valuing the business, both experts stated at trial that they used the date Winstead filed suit as the valuation date. Inexplicably, Alexander adjusted the price of the missing fish sales by increasing their value by twenty-five percent to "current prices" to account for what he deemed an increase in value from 2009-2011. Any valuation on his right to recover for the 2008 lost fish sales ended the date he filed suit in September of 2009 to dissolve the LLC. *See, e.g.,* ***Hollis v. Hill***, 232 F.3d 460, 472 (5th Cir. 2000) (holding the presumptive valuation date on a freeze-out claim to be the date of filing the suit). Both experts stated at trial they used that date in their valuation of Kilby Brake. The use of this date will allow the Court to take into account both parties' actions, inactions and business decisions which affected the value of the business from the time Winstead left Kilby Brake until suit was filed. Alexander's calculations were purely speculative in nature and artificially inflated the value of Kilby Brake. Therefore, we are compelled to reverse and remand for a new trial on issues regarding any breach of fiduciary duty with regard to the loss of fish inventory.

V. **Whether Kilby Brake is entitled to a new trial.**

31

¶67. During discovery, Winstead produced his tax returns from 2006 to 2009 which showed substantial income as coming from the Winstead Cattle Company. The only other income listed on Winstead's tax returns was from Kilby Brake and his wife's job. Winstead had also produced two Forms 1099 from a fish farmer named Scott Kiker, which did not appear on his tax returns. Kilby Brake's theory was the entries for "cattle" represented income from sales of Kilby Brake fish Winstead was brokering and thus, it sought to compel production of all of the Winstead Cattle Company's financial records. Winstead admitted in his deposition and again at trial that the Winstead Cattle Company did no actual business, and it was simply his hunting camp. The trial court denied Kilby Brake's motion to compel discovery into Winstead's finances.

¶68. While cross-examining Winstead, counsel for Kilby Brake began to question him about the two Forms 1099 Winstead had produced in discovery showing income from Kiker. Winstead testified that he would often act as a middle man if he knew of a farmer who was in need of fish and another who had fish for sale; taking a commission for brokering the deal. Kilby Brake's counsel was not allowed to question Winstead about where this income from brokering fish sales appeared on the tax returns, because the returns were prepared by Winstead's accountant. The trial court ruled Winstead did not have personal knowledge of the returns and thus, the returns were inadmissable hearsay.

¶69. A trial court's discovery orders will not be disturbed unless there is an abuse of discretion. *Dawkins v. Redd Pest Control Co., Inc.*, 607 So. 2d 1232, 1235 (Miss. 1992). This Court said where "important information is denied a litigant reversal will obtain." *Id*. "'[A]dmission or suppression of evidence is within the discretion of the trial judge and will

not be reversed absent an abuse of that discretion.'" ***Church of God Pentecostal, Inc. v. Freewill Pentecostal Church of God, Inc***., 716 So. 2d 200, 210 (Miss. 1998) (citation omitted) (quoting ***Sumrall v. Mississippi Power Co.***, 693 So. 2d 359, 365 (Miss. 1997)). Even if an abuse of discretion has occurred, "for a case to be reversed on the admission or exclusion of evidence, it must result in prejudice and harm or adversely affect a substantial right of a party." ***Terrain Enter., Inc. v. Mockbee***, 654 So. 2d 1122, 1131 (Miss. 1995) (citations omitted).

¶70.  Kilby Brake's attorney made a proffer that he would have questioned Winstead on where the income from Kiker appeared on his income tax return and whether it was indicated under the Winstead Cattle Company entry, because Winstead already had testified Winstead Cattle Company did no business and was merely a hunting camp.  Winstead cited ***U.S. Fidelity & Guaranty Co. v. Whitfield*** as authority for the proposition that it is inadmissible hearsay for a witness who did not prepare a tax return to testify as to that tax return because he lacks personal knowledge. *See **U.S. Fid. & Guar. Co. v. Whitfield***, 355 So. 2d 307 (Miss. 1978).  However, this case is easily distinguishable.

¶71.  In ***U.S. Fidelity***, the insured's witness, a certified public accountant (CPA),  testified as to the amount of the loss the insured sustained after a fire, basing it on the inventory reflected in the insured's federal income tax return. ***Id.*** at 309.  This Court held that, because the witness CPA did not prepare the insured's tax return nor discuss it with the actual preparer, the witness CPA's testimony "was rank hearsay." ***Id***.  In the case at bar, Kilby Brake was questioning Winstead about his own tax return.  The signature line of the federal income tax return, Form 1040, states that, under the penalty of perjury, the signer has

examined the return and believes it to be true and complete. Further, any information used by Winstead's accountant in calculating Winstead's income tax return would have come from Winstead. Thus, we find the trial court's decision not to allow Kilby Brake to cross examine Winstead on his tax return because he lacked personal knowledge was error.

¶72. Winstead argues that, if there were any errors in the trial court's decisions, they were harmless. However, the record indicates a third Form 1099 from Kiker to Winstead was found in the company truck which Winstead returned after the jury verdict against him on Kilby Brake's replevin claim. Further, Kiker testified that he had received a load of fish from Kilby Brake that Winstead claimed Simmons was going to "drain'em in the ditch." Kiker testified there was no paperwork on the transaction; that he sold this load of fish, gave Winstead a commission and did not pay Kilby Brake for the sales.

¶73. From the evidence noted above, we find the trial court's refusal to allow both discovery into the finances of Winstead and questions concerning Winstead Cattle Company on his tax return prevented Kilby Brake and the jury from finding out whether Winstead was selling fish from Kilby Brake and disguising it on his income tax returns, thereby prejudicing Kilby Brake's ability to present its case. What happened to the fish inventory was central to both parties' theories of the case. Importantly, the decisions by the trial court denied Kilby Brake the ability to present its case as to what happened to the fish. The record shows there were years in which Winstead received substantial income from brokering fish sales, almost $20,000 in one year. He admitted that Winstead Cattle Company did no business and was simply his hunting camp, yet it made significant amounts of money. We therefore reverse the trial court's decision to deny discovery into the finances of Winstead and remand for a

34

new trial on Winstead and Kilby Brake's breach-of-fiduciary-duty claims, as they pertain to the missing fish sales. Specifically, Kilby Brake should be allowed discovery into the finances of Winstead concerning outside income and specifically the stated income from Winstead Cattle Company.

**VI.    Whether Winstead met the requisite elements of slander *per se*.**

¶74.    The jury found Simmons guilty of slander *per se* and awarded Winstead $5,000 on this claim. Simmons argues that Winstead never presented any evidence that he made slanderous statements about Winstead prior to judicial proceedings. Further, Simmons argues no witnesses testified that he published the alleged slanderous statements about Winstead. Finally, Simmons argues truth as a defense and that he was entitled to his opinion of Winstead as a hatchery operator.

¶75.    To prove slander, Winstead had the burden to prove the following elements: (1) a false and defamatory statement concerning the plaintiff; (2) unprivileged publication to a third party; (3) fault amounting to at least negligence on the part of the publisher; and (4) either actionability of the statement irrespective of special harm or the existence of special harm caused by the publication. *Franklin v. Thompson*, 722 So. 2d 688, 692 (Miss. 1998) (citations omitted). Because publication is an essential element to slander, "if the words were spoken only to the complaining party or to his agent, representing him in the matter discussed . . . it is not such a publication as will support an action for slander." *Kirk Jewelers v. Bynum*, 75 So. 2d 463 (Miss. 1954).

¶76.    In Mississippi, statements are actionable *per se* if they are:

35

(1) Words imputing the guilt or commission of some criminal offense involving moral turpitude and infamous punishment. (2) Words imputing the existence of some contagious disease. (3) Words imputing unfitness in an officer who holds an office of profit or emolument, either in respect of morals or inability to discharge the duties thereof. (4) Words imputing a want of integrity or capacity, whether mental or pecuniary, in the conduct of a profession, trade or business; and in this and some other jurisdictions (5) words imputing to a female a want of chastity.

*Speed v. Scott*, 787 So. 2d 626, 632 (Miss. 2001) (quoting *W.T. Farley, Inc., v. Bufkin*, 132 So. 86, 87 (Miss. 1931)).

¶77.   Further, "[t]he slander . . . must be clear and unmistakable from the words themselves and not be the product of any innuendo, speculation or conjecture." *Baugh v. Baugh*, 512 So. 2d 1283, 1285 (Miss. 1987).  If the language is actionable *per se*, general damages are presumed to result. *McCrory Corp. v. Istre*, 173 So. 2d 640, 646 (Miss. 1965) (citations omitted).  It is well settled that truth is a complete defense to a charge of slander. *Franklin*, 722 So. 2d at 692.

¶78.   When analyzing a slander claim, Mississippi courts first determine if "the occasion called for a qualified privilege" and if a qualified privilege does exist, "the Court must then determine whether the privilege is overcome by malice, bad faith, or abuse." *Eckman v. Cooper Tire & Rubber Co.*, 893 So. 2d 1049, 1052 (Miss. 2005) (citing *Garziano v. E.I. Dupont de Numours & Co.*, 818 F.2d 380, 386-87 (5th Cir. 1987) (applying Mississippi law))).  One of the qualified privileges recognized by this Court protects communications between employers and their employees. *See Holland v. Kennedy*, 548 So. 2d 982, 987 (Miss. 1989).  In speaking of this privilege, this Court held:  "[t]he law guards jealously the right to the enjoyment of a good reputation, but public policy, . . . the interests of society, and

36

sound business demand that an employer . . . be permitted to discuss freely with an employee, or his chosen representative, charges made against the employee affecting the latter's employment." ***Killebrew v. Jackson City Lines***, 82 So. 2d 648, 650 (Miss. 1955). In describing the contours of the employer/employee privilege, this Court held "'[w]hen qualified privilege is established, statements or written communications are not actionable as slanderous or libelous absent bad faith or malice if the communications are limited to those persons who have a legitimate and direct interest in the subject matter.'" ***Young v. Jackson***, 572 So. 2d 378, 383 (Miss. 1990) (quoting ***Bush v. Mullen***, 478 So. 2d 313 (Miss. 1985) (internal citations omitted)).

¶79.     In his amended complaint, Winstead asserted claims for slander and slander *per se* against Simmons. In his count for slander, he accused Simmons of telling members of the catfish farming community that Winstead stole fish from Kilby Brake. In his complaint for slander *per se*, he asserted the statements which were inherently defamatory were the statements adopted in his slander argument. The trial court granted Simmons's motion for a directed verdict on Winstead's slander claim but denied his motion on the slander *per se* claim.

¶80.     No witnesses testified that Simmons told them Winstead was stealing fish from Kilby Brake. The only evidence in the record of Simmons stating Winstead stole fish was when he read his deposition testimony on the stand. Winstead's attorney asked if Simmons had ever used the word stealing when talking about Winstead. Simmons responded "not to my recollection." Winstead's attorney then asked Simmons to read from his prior deposition testimony. Simmons read the relevant portion, in which he stated, "I knew we needed to get

out of this situation . . . when he was falsifying fish movement tickets . . . [i]t was stealing from, from one of my other entities."

¶81.   Although Simmons said Winstead was stealing from Kilby Brake, Winstead did not put on any proof that Simmons published these statements to third parties.  Simmons's deposition testimony was about why he fired Winstead.   Further, it was in response to a question from Winstead's attorney about why Winstead was fired.  Winstead's response was published only to Winstead's chosen representative and regarded charges made against Winstead affecting his employment.  Thus, we find no merit in this argument.

¶82.   The other evidence Winstead argues proves his slander *per se* claim developed during trial.  Simmons was asked by Winstead's counsel whether he believed that Winstead could not run a successful operation because he was golfing, hunting, drinking, and gambling all of the time.  Simmons responded he believed so, and that he probably said that to people. Therefore, the only evidence in front of the jury on this claim was Simmons's own admission that he "probably" expressed his  belief to other people.  The record does not reveal the identities of these other parties.

¶83.   Testimony from other witnesses indicated that Winstead drank to excess at times, hunted often, golfed, and had gambled in a weekly card game regularly for years.  All this occurred while he was working for Kilby Brake. Further, it was undisputed that Kilby Brake was successful for only two of the eight years Winstead was hatchery operator.  However, no witness testified that he or she could say Winstead's golfing, hunting, drinking, or gambling interfered with his abilities to operate Kilby Brake.

38

¶84.    Winstead bore the burden to prove by a preponderance of the evidence that Simmons published the above statements to parties outside of those within the circle of privileged individuals and that these statements were indeed false.  We find that, alone, the statements of Simmons that he probably had expressed his belief to others insufficient for Winstead to carry the burden that Simmons's statement were published to unprivileged third parties or that they were even false.  Therefore, we reverse the judgment for slander *per se* and render a decision in favor of Simmons.

## CONCLUSION

¶85.    We reverse the judgment of the Yazoo County Circuit Court and remand this case for a new trial on whether Winstead or Kilby Brake  is entitled to any damages regarding Winstead's pay and personal charges.  In addition, we reverse and remand for a new trial on the breach-of-fiduciary-duty claim as to liability and damages for the missing fish and any damages that may occur as a result. We also reverse and render all claims against Phillips Brothers.  Further, we reverse and render the claims for corporate freeze-out and slander *per se* against Simmons.  Because we reverse for a new trial, we also reverse all awards of punitive damages, attorneys' fees, and interest.

¶86.    **REVERSED; REMANDED IN PART; RENDERED IN PART.**

**DICKINSON AND RANDOLPH, P.JJ., LAMAR, KITCHENS, CHANDLER, PIERCE, KING AND COLEMAN, JJ., CONCUR.**

# EXHIBIT

SCHEDULE "A"

| Member | Property Contributed of Ownership | Percentage of Ownership |
|---|---|---|
| Harry D. Simmons, Jr. | | 33 1/3rd |
| Ray Winstead | | 33 1/3rd |
| Phillips Brothers, a Partnership | | 33 1/3rd |